Robb, P.J.
*239 {¶1} Defendant-Appellant Hakeem Henderson appeals after being convicted in the Mahoning County Common Pleas Court for engaging in a pattern of corrupt activity and two counts of aggravated murder. He raises issues with: the use of testimonial hearsay under the forfeiture by wrongdoing exception; the refusal to sever his trial from his co-defendant's trial; the sufficiency of the evidence supporting complicity to aggravated murder; speedy trial time; and cumulative error. For the following reasons, the trial court's judgment is affirmed.
STATEMENT OF THE CASE
{¶2} On April 11, 2013, Appellant was indicted for the aggravated murders of Adam Christian and R'Amel Hayes, which occurred days apart in November 2011. Both counts carried firearm specifications. Appellant's brother, Michael Austin Jr., was jointly indicted on these offenses (and charged with attempted murder and felonious assault in the shooting of another victim). Dewaylyn Colvin was also jointly indicted in the Christian and Hayes murders, but the court eventually severed his case. A superseding indictment was filed on May 16, 2013, adding aggravated murder charges against Austin and Colvin for the deaths of Ryan Slade and Keara McCullough, which occurred in September 2012. A second superseding indictment was filed on May 21, 2015, adding Appellant as a defendant for the Slade and McCullough murders, charging Appellant with possession and trafficking of heroin, and charging him with engaging in a pattern of corrupt activity (a first-degree felony with an enhanced sentence where one of the activities was aggravated murder or other listed offenses). This indictment added as defendants Vincent Moorer, Melvin Johnson Jr., and Nahdia Baker; the court thereafter severed these defendants from the case against Appellant and Austin.
{¶3} The jury trial against Appellant and Austin commenced on April 25, 2016. There was testimony outlining the structure of a drug distribution organization run by Colvin and Moorer, including testimony by former members of the organization. (Tr. 441, 456, 1165-1170, 1182-184, 1195, 1296). Appellant, Austin, and Hayes were described as enforcers, hitters, or shooters. (Tr. 466, 793-795, 803, 807-809, 1202, 1301-1302, 1311-1314, 1331). A participant close to Moorer testified the organization made a "couple hundred thousand" dollars a month. (Tr. 1297). He explained Appellant's role was often the driver as Appellant had a license and insurance, noting a police officer would be more likely to search a vehicle during a traffic stop if the driver was unlicensed and uninsured. (Tr. 1313-1314).
{¶4} A female resident of a housing project on the east side of Youngstown known as "Victory Estates" testified Adam Christian was visiting her apartment on November 12, 2011. They consumed pills and marijuana. (Tr. 592). Her cousin, R'Amel Hayes, called her multiple times to inquire who was at her apartment. (Tr. 563). Hayes later arrived at the apartment and spoke to Christian about helping Hayes get his gun unjammed. (Tr. 569-570).
*240 Around this time, Christian exited the back door and went outside to vomit, followed by Hayes. (Tr. 571). The female resident heard gunshots. When she went to her back door, Hayes was outside holding the door so she could not exit, and she argued with him. (Tr. 576, 597). Upon looking out her window, she saw Christian lying on the ground. After Hayes released her door, she went outside where she saw Christian bleeding. Hayes left, and she asked the dying victim whether Hayes did this to him. She testified Christian shook his head to answer in the negative, she asked who did shoot him, and he answered, "Mike," at which point he spit out blood and did not speak again. (Tr. 580, 599).
{¶5} This witness was thereafter heard yelling that Mike Austin was the shooter as others arrived to assist the victim; this was heard over a 911 call as well. (Tr. 641). A bystander who heard her yelling testified she noticed Austin at the housing project earlier in the day with two others; all three were wearing all black and hoodies on a warm day. (Tr. 626-627). Later that night, this bystander saw Austin and another person outside of the targeted apartment; she believed Austin was armed due to a bulge she spotted in his jacket. (Tr. 636).
{¶6} Just prior to the shooting, Christian's aunt arrived at the housing project and called 911 because she saw two young men walking on the street with guns, wearing all black with hoodies. (Tr. 520-521). After a police car circled and left, she called again to report she then saw them stand by an apartment before splitting up, with one going to the front and one going to the back. (Tr. 524-525). She thereafter heard gunshots. Christian died before the police arrived. Four bullets were recovered from his body. The shot to his face occurred from a very close range. (Tr. 1447).
{¶7} Days after this homicide, the body of R'Amel Hayes was found at an intersection on the east side of Youngstown. (Tr. 732, 753). He had been shot 18 times. (Tr. 1483). An inmate testified Austin started talking to him in jail after learning of the inmate's paralegal background. This inmate said Austin admitted he committed the Christian murder, explaining Appellant drove and Hayes went in to lure the victim outside. (Tr. 794-795). Austin expressed he had to kill Hayes because it appeared Hayes was talking too much about the Christian murder. (Tr. 803-805). According to the inmate, Austin said Appellant drove with Colvin in the front seat and Austin in the backseat next to Hayes; Austin then shot Hayes and kicked his body out of the vehicle. (Tr. 804-805).
{¶8} During trial, a key state's witness refused to appear to testify. A hearing was held to determine whether the statements of this organization member who sold drugs for the organization could be used at trial under the forfeiture by wrongdoing exception to the hearsay exclusion and to the confrontation clause. The court overruled objections by the defense, allowing the admission of a video of the witness's February 26, 2013 statement to police and the testimony of a detective about his transcribed follow-up interview with this witness on February 4, 2015.
{¶9} Regarding the Christian murder, this witness said he was at his house with his brother when Appellant arrived with Colvin, Austin, and Hayes. They asked for masks as they were going to Victory Estates to "take care of" whatever Christian they could find as they heard a member of the Christian family was planning to rob Colvin. (DVD Tr. 10); (Tr. 1122-1123). He said Appellant, Austin, and Hayes all made statements in agreement with the plan voiced by Colvin. (Tr. 1123-1126). This witness testified the group left with Appellant *241 driving. (DVD Tr. 15); (Tr. 1125). They returned to the witness's house later (without Hayes). Austin announced he shot a Christian but did not know which one he shot as they looked alike. (DVD Tr. 21, 23, 29-30); (Tr. 1125, 1127). This witness and his brother then provided Appellant and Austin with a house to stay at in Boardman. They told the witness there had been a $10,000 price set for the hit so they went over and "served these dudes" and "put some work in" (meaning they shot or killed someone). (DVD Tr. 24-25); (Tr. 1128).
{¶10} This witness said the defendants then planned to kill Hayes because he did not keep quiet about the Christian murder. (DVD Tr. 42-43). On the day Hayes was last seen, this witness saw Hayes in a vehicle with Colvin and Austin being driven by Appellant. (DVD Tr. 43-44).
{¶11} Later while high, Austin told this witness how both murders proceeded. (Tr. 1130). As for the Christian murder: Colvin and Appellant dropped off Austin and Hayes; Hayes went in the apartment to lure Christian outside; Christian was vomiting outside; and Austin shot Christian. (DVD Tr. 33-36). As to the Hayes murder, Austin told the witness: Hayes kept telling Austin he loved him as if he suspected Austin's plot against him; Austin shot Hayes; and Colvin vomited and ran. (DVD Tr. 43-49, 52).
{¶12} This witness heard Austin express anger that no funds were paid as expected for the Christian murder. (DVD Tr. 53-54). Another organization member testified he heard Appellant and Austin complaining they never received payment for various hits; Appellant said they were supposed to "come in, pull [our] moves, get paid and go back and leave town." (Tr. 1301-1311).
{¶13} As to the attempted murder and felonious assault charges against Austin, the victim of a shooting testified. He told police Austin was the shooter and theorized it may have been revenge for his involvement in a burglary of the apartment of Moorer's girlfriend. (Tr. 1020-1028). An organization member who was close to Moorer testified Moorer gave Austin the gun to use for this purpose. (Tr. 1320).
{¶14} As to the Slade and McCullough murders, there was testimony from a member of the organization that Moorer ordered the shooting of Ryan Slade because Slade assaulted Moorer's girlfriend, who was also a member of the organization; Keara McCullough happened to be in the vehicle with Slade at the time of the shooting. (Tr. 1182-1184). Two other members of the organization confirmed this and testified Austin admitted killing these two victims. (Tr. 1202, 1307).
{¶15} During trial, the court entered an acquittal on the possession and trafficking charges. The jury found Appellant guilty of two counts of aggravated murder with firearm specifications for the deaths of Christian and Hayes and guilty of engaging in a pattern of corrupt activity with the sentencing enhancement. The jury found Appellant not guilty of aggravated murder or the lesser included offense of murder for the deaths of Slade and McCullough.[1] In a May 11, 2016 judgment entry, the court sentenced Appellant to life in prison with parole eligibility after 30 years for each aggravated murder count plus three years on each the firearm specifications. He received 11 years on the pattern of corrupt activity count. The sentences on the three counts were imposed concurrently.
*242 ASSIGNMENT OF ERROR ONE: HEARSAY/CONFRONTATION
{¶16} Appellant sets forth five of assignments of error, the first of which provides:
"[T]he trial court erred in allowing in un-cross-examined hearsay, such being the only evidence implicating Henderson, in violation of the Sixth and Fourteenth Amendments. * * * the forfeiture exception to the confrontation clause applied only when a defendant prevented a witness from testifying. Here, nothing implicated Henderson in wrongdoing * * *."
{¶17} This assignment of error deals with the court's decision to admit the statements of the witness who: lived on Forest Avenue; was a fellow member of the organization; heard the four planning to kill a member of the Christian family; heard them ask for masks; was present when his brother provided masks; saw them leave with Appellant driving; was at the same house when they returned (without Hayes); heard them boasting about the shooting performed by Austin; brought Appellant and Austin to a house in Boardman after the shooting; saw the group before the Hayes shooting with Appellant driving; and said Hayes was killed because he was not keeping quiet about the Christian murder. Before admitting this witness's statements, the trial court held an evidentiary hearing during trial to determine whether the witness's statements to police could be admitted under the forfeiture by wrongdoing exception. (Tr. 873-1017).
{¶18} At the admissibility hearing, testimony was provided by this witness's parole officer, a prosecutor, and three police officers. Texts from the witness to another prosecutor (who was also present at the last meeting with the witness) were provided to the court, and the court was asked to take judicial notice of issues with threatened witnesses and the sealing of various parts of the record. The court concluded the witness was unavailable, the defendants or their functionaries engaged in wrongdoing that resulted in the witness's unavailability, and their purpose was to cause the witness to be unavailable for trial. The court said this decision was not only supported by a preponderance of the evidence but was supported by clear and convincing evidence. (Tr. 1017).
{¶19} There is no dispute the witness's statements to the police were testimonial. If a hearsay statement being considered for admission was testimonial, it is subject to the confrontation clause. Crawford v. Washington , 541 U.S. 36, 61-62, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, "[t]he Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts." Reynolds v. United States , 98 U.S. 145, 159, 25 L.Ed. 244 (1879). "The rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds." Crawford , 541 U.S. 36, at 62, 124 S.Ct. 1354.
{¶20} Therefore, even when confrontation rights apply, testimonial hearsay can be admitted under the common law forfeiture by wrongdoing exception (also called wrongful procurement of unavailability doctrine). State v. Fry , 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 108, citing Giles v. California , 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). The doctrine applies when the defendant engaged in conduct designed (with intent) to prevent the witness from testifying. Id. (explaining intent is required). Defendants forfeit the right to confrontation if they "seek to undermine the judicial process by procuring or coercing silence from witnesses * * *." Davis v. Washington , 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
*243 {¶21} An evidentiary rule was promulgated to encompass this forfeiture principle. See State v. McKelton , 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 96. Pursuant to Evid.R. 804(B)(6), the forfeiture by wrongdoing hearsay exception permits the admission of: "A statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." The type of wrongdoing covered goes beyond murder or physical assault of the witness; in fact, "the wrongdoing need not consist of a criminal act." 2001 Staff Note to Evid.R. 804(B)(6) ("Encouraging a witness to leave the state is wrongdoing in this context because no person has the legal right to refuse to provide testimony in the absence of a privilege or other rule of evidence."). See also Giles , 554 U.S. at 374, 128 S.Ct. 2678 (the common law forfeiture rule had a purpose of "removing the otherwise powerful incentive for defendants to intimidate, bribe, and kill the witnesses against them" and coincided with the court's power to protect the integrity of its proceedings).
{¶22} In using the forfeiture by wrongdoing exception, the state must show by a preponderance of the evidence: (1) the defendant's wrongdoing resulted in the witness's unavailability and (2) one purpose was to cause the witness to be unavailable at trial. State v. Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶¶ 84, 87, 90. The state need only show the defendant's wrongdoing which caused the witness's unavailability "was motivated in part by a desire to silence the witness." Id. at ¶¶ 84, 90 (a defendant can have various purposes, and the state need not show the defendant's sole motivation was to eliminate the victim as a potential witness). In making the admissibility decision, a court is not bound by the rules of evidence. Evid.R. 104(A) (except rules on privilege). Although evidentiary decisions on hearsay are typically reviewed for an abuse of discretion, courts are instructed to "review de novo evidentiary rulings that implicate the Confrontation Clause." McKelton , 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 97.
{¶23} In appealing this decision, Appellant emphasizes the forfeiture by wrongdoing exception applies only if the defendant intended to and did prevent the witness from testifying. He argues the prosecution failed to prove by the preponderance of the evidence that he was the person who engaged in any wrongdoing that caused the witness to be unavailable with purpose to cause this unavailability. He insists nothing implicated him in the wrongdoing as there was no indication he personally threatened the witness and there was no direct evidence he participated in inciting another to make threats to the witness.
{¶24} First, the forfeiture by wrongdoing rule only requires the defendant to intentionally procure the witness's unavailability. Davis , 547 U.S. at 833, 126 S.Ct. 2266 ("seek to undermine the judicial process by procuring or coercing silence from witnesses"). To procure does not require the defendant himself to be the one who personally contacts the witness. As Giles observed in explaining why intent was required, the common law interpretations of the rule included situations where: a defendant "schemed" to bring about the absence from trial through his "contrivance"; a defendant designed to bring about the result procured, which could include "when he uses an intermediary for the purpose of making a witness absent"; and a witness "had been kept out of the way by the prisoner, or by someone on the prisoner's behalf, in order to prevent him from giving evidence against him."
*244 Giles , 554 U.S. at 361, 128 S.Ct. 2678. Therefore, a defendant's intentional procuring of witness's unavailability from trial may be performed by others acting on his behalf. Rice v. Marshall , 709 F.2d 1100, 1104 (6th Cir.1983) (finding it reasonable for the trial court to conclude the witness was intimidated into silence by the defendant, who was an enforcer for his gang, or by his "functionaries"), adopting State v. Rice , Ohio App. Ct. No. CA-2624 (Nov. 16, 1979) (where state court held the trial court reasonably concluded the witness had been intimidated into silence by appellant "or his functionaries"). See also United States v. Mastrangelo , 693 F.2d 269, 273-74 (2d Cir.1982) (finding a defendant's involvement in witness-unavailability through "knowledge, complicity, planning or in any other way" waives confrontation clause objections).[2]
{¶25} As to whether there was adequate evidence showing Appellant was involved in the witness intimidation, the standard is a mere preponderance of the evidence. Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 87. A preponderance of the evidence is defined as the measure of proof that convinces the judge that "the existence of the fact sought to be proved is more likely than its nonexistence." State ex rel. Doner v. Zody , 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, ¶ 54 (as opposed to the higher standard of clear and convincing evidence which must produce a "firm belief or conviction" in the mind of the factfinder).
{¶26} At the admissibility hearing, there was a discussion of issues with witness security and the resulting sealing of various parts of the record. One witness (the girlfriend of Moorer) had been killed in 2013 and another witness (the brother of the witness at issue) survived a shooting. (Tr. 907, 921, 928). The state asked the trial court to listen to the statement of a person who said the girlfriend was killed on behalf of the defendants after her name was viewed on a witness list. (Tr. 945-946). A co-defendant whose case was severed had her bond revoked after her attorney left her with a counsel-only file and she contacted a witness. (Tr. 907). In fact, Hayes (a complicitor in the Christian murder) was alleged to have been killed because he was talking about the murder.
{¶27} A police officer, a detective, and an officer assigned to the U.S. Marshal's Task Force told the court how they searched for the witness. There was evidence the witness had been cooperative with the investigation at the time of the initial statement and in the years thereafter. One week prior to the admissibility hearing, he attended a meeting to prepare for his testimony in this trial. He met with the prosecutors at the parole office to protect himself as he feared he would be spotted at the courthouse and it would be known he was about to testify in this trial. (Tr. 882). Notably, this witness had information *245 on Appellant, Austin, and Colvin (not the other jointly indicted individuals). (Tr. 902-903). However, the witness was informed Colvin was in the process of pleading guilty; Colvin's trial had been severed from this trial in any event, and he was not being tried at the time of the meeting. (Tr. 901-902).
{¶28} The witness's parole officer testified the witness revealed (at the meeting about the trial of Appellant and Austin) that the defendants made multiple threats against him and his family. (Tr. 884, 892-893). When he was reminded the defendants were incarcerated, he responded, "You still don't understand. They have people out there." (Tr. 884). The parole officer took this to mean the defendants had people they could direct to carry out the threats. A prosecutor's testimony confirmed the contents of this conversation with the witness. (Tr. 900, 904). Based on representations at the Thursday meeting, the witness was still cooperative and planning to testify the next week. (Tr. 885).
{¶29} The other prosecutor, who was also present at the meeting, texted the witness the next week to remind him he had to be in court the next day. He received a response text from the witness saying, "They say if I go they're going to kill my family, so what do I do? I should kill myself." A subsequent text included the statements: "Not running from you. They going to kill my family." (Tr. 972). The prosecutor noted these disclosures occurred after opening statements, which was the first time the information in the sealed (counsel-only) witness list was released. The prosecutor also asked the sheriff's office to prepare the video from the courtroom to show the defendants signaled to spectators.
{¶30} A police officer looking for the absent witness testified the witness's mother, step-father, and sister all informed him the witness was afraid to testify at this trial against these defendants for fear of retribution against him and his family. (Tr. 935-937). The step-father expressed the threats were being voiced by the defendants' mother. (Tr. 935). The maternal grandmother of the witness's young child advised the officer there was "a sincere fear for his safety and the safety of his family." (Tr. 931-932).
{¶31} A detective testified he was informed by the witness's sister that the witness would not be testifying at the trial against these two defendants as there is a "$10,000 hit" on him and "[t]hey want to try to kill him." (Tr. 956, 960). An officer with the marshal's task force testified he was told by the witness's friend that the witness was afraid he would be killed if he testified. (Tr. 966-967). Also, the maternal uncle of the witness's child told the officer the witness and his family were "receiving threats that if the witness testified in this trial, he would be harmed." (Tr. 968-969).
{¶32} Circumstantial evidence inherently possesses the same probative value as direct evidence. State v. Treesh , 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). And, rational inferences are permissible (and evaluated in the state's favor in ascertaining the sufficiency of the evidence). See, e.g., State v. Filiaggi , 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999). In reviewing the evidence presented by the state at the admissibility hearing, the rational inferences available, and the surrounding facts and circumstances, we conclude there was sufficient evidence of this allegation that Appellant participated in procuring the witness's absence and the preponderance of evidence supports such a finding. That Appellant was involved in intentionally procuring the witness's unavailability is "more likely than" his claim that he was not involved in such procurement. See *246 Zody , 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, at ¶ 54. A "firm belief or conviction" (such as required for the clear and convincing standard) is not required in applying the preponderance of the evidence standard. See id. ; Hand , 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, at ¶ 87. In accordance, we conclude there was no error in applying the forfeiture by wrongdoing exception to the confrontation clause and to the hearsay exclusion. This assignment of error is overruled.
ASSIGNMENT OF ERROR TWO: JOINDER
{¶33} Appellant's second assignment of error asserts:
"[T]he trial court erred in denying various motions for relief from prejudicial joinder. * * * if trial with a co-defendant prejudices a defendant, then a court must order separate trials."
{¶34} Pursuant to Crim.R. 8(B) : "Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct." This rule also states these "defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count." Crim.R. 8(B). Joinder conserves judicial resources, decreases prosecutorial time and expense, diminishes inconvenience to witnesses, and minimizes incongruous results. State v. Kozic , 7th Dist. No. 11 MA 160, 2014-Ohio-3788, 2014 WL 4291627, ¶ 71, citing State v. Thomas , 61 Ohio St.2d 223, 225, 400 N.E.2d 401 (1980).
{¶35} If it appears a defendant is prejudiced by a joinder of defendants in an indictment, then the court shall grant a severance of defendants or provide such other relief as justice requires. Crim.R. 14. "The standard of review is abuse of discretion, since trial courts are given considerable latitude in determining whether a severance is warranted." State v. Schiebel , 55 Ohio St.3d 71, 89, 564 N.E.2d 54 (1990). A court should consider whether a joint trial would be so "manifestly prejudicial" that severance is required. Id. at 89, 564 N.E.2d 54. The defendant "bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance." State v. Brinkley , 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29 (where the defendant sought severance of his multiple offenses, the state can negate claims of prejudice by showing the evidence of a defendant's other acts would have been admissible or by showing the evidence of each joined offense was simple and direct).
{¶36} Appellant argues the court should have severed the case against him from the case against his brother, citing Crim.R. 14. He urges: the case was complex; there were differing degrees of culpability regarding himself and his co-defendant Austin; a jail inmate testified to incriminating statements made by Austin while incarcerated; and there was more evidence against Austin who was the shooter, whereas Appellant was alleged to be the driver who was present for the planning (pointing to the argument under the next assignment of error on sufficiency of the evidence as to Appellant's complicity to aggravated murder).
{¶37} The state responds by arguing joinder is the rule rather than the exception and joinder here served the policies behind the rule. The state posits the court should presume the jury followed the court's instruction to consider the evidence against each defendant separately. We are asked to consider the circumstances showing *247 the jury clearly did consider the evidence against each defendant separately.
{¶38} Although admissions by Austin to a fellow jail inmate were admitted at their joint trial, those statements were not testimonial and thus Bruton had no application because the confrontation clause had no application. State v. Carter , 7th Dist., 2017-Ohio-7501, 96 N.E.3d 1046, ¶¶ 37-39 ("As subsequent federal and Ohio state decisions have been rendered limiting the confrontation clause's application to testimonial statements, prior principles must be viewed under the lens of the intervening precedent"), addressing Bruton v. United States , 391 U.S. 123, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In Carter , we held the admission of the principal actor's statement to a friend while both were incarcerated (which incriminated himself and the appellant in a robbery and homicide) did not implicate the confrontation clause as the primary purpose of the statement was unrelated to creating evidence for the prosecution. Carter , 7th Dist., 2017-Ohio-7501, 96 N.E.3d 1046, at ¶ 36, citing Ohio v. Clark , --- U.S. ----, 135 S.Ct. 2173, 2181, 192 L.Ed.2d 306 (2015).
{¶39} Nevertheless, Appellant utilizes the admission of the inmate's testimony as to what Austin told him about the offenses to bolster his claim of prejudice from joinder. He cites Zafiro where the Court expressed concern that evidence of a codefendant's wrongdoing could improperly cause a jury to conclude a defendant is guilty and where the Court observed: "When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. * * * Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice." Zafiro v. United States , 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). The Court also noted "[t]he risk of prejudice will vary with the facts in each case" and as the risk increases, the trial court is more likely to sever the trials; although, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id.
{¶40} Although the trial court refused to sever Appellant's case from Austin's case, the court granted severance and allowed Appellant to be tried separately from Colvin, Moorer, and two other jointly indicted individuals. The remaining defendants at this trial (Appellant and Austin) were brothers and members of the same organization with similar roles in the organization. The pattern of corrupt activity charge dealt with these roles in the organization. Both Appellant and Austin were alleged to have committed four aggravated murders for the organization. There are no allegations the defendants utilized mutually antagonistic or irreconcilable defenses. The evidence presented at trial was not complex. Rather, the evidence was straightforward, direct, and simple to follow as to each offense and as to each defendant's role. Regarding degree of culpability, a principal and complicitor have the same culpability (as discussed in the next assignment of error). See R.C. 2923.03(A)(2). See also R.C. 2923.03(F). Plus, the existence of differing levels of culpability among defendants does not necessarily justify severance. Schiebel , 55 Ohio St.3d at 88-89, 564 N.E.2d 54. A review of the simplicity of the evidence and the defendants' culpability levels does not give rise to an indication the jury was prevented from making a reliable judgment about guilt or innocence.
{¶41} In addition, the jury was instructed to consider the evidence against each defendant separately. The court explained the jury could find one defendant not guilty even if it finds the other defendant guilty. In fact, the jury found Appellant *248 not guilty of two counts of aggravated murder and not guilty of the lesser included offense of murder regarding the Slade and McCullough victims, even though Austin was convicted of both aggravated murder counts in the deaths of these two victims. This helps establish the jury properly compartmentalized the simple and direct evidence attributable to each defendant and was capable of segregating the proof required for each offense.
{¶42} We also note two alternative charges, attempted murder or felonious assault against a victim who did not die from his gunshot wounds, were levied only against Austin and not against Appellant. However, "[n]ot all defendants need be charged in each count." Schiebel , 55 Ohio St.3d at 88-89, 564 N.E.2d 54. In any event and significantly, Austin was acquitted of these counts, further diminishing the appearance of prejudice to Appellant from joinder with Austin.
{¶43} The circumstances addressed by Appellant here in support of his contention that he suffered prejudice from joinder with one of his co-defendants are not so manifestly prejudicial that severance was mandated. Appellant's arguments against joinder specified under this assignment of error are overruled as he has not met his burden of demonstrating an abuse of discretion or prejudice.
ASSIGNMENT OF ERROR THREE: SUFFICIENCY FOR COMPLICITY
{¶44} Appellant's third assignment of error contends:
"[S]ufficient evidence did not support the conviction in this case. At issue, in a murder-by-complicity case trial, if the state proves only the defendant was 'present.' Then the evidence is insufficient * * *. Here, the state proved only presence."
{¶45} If a conviction is not supported by sufficient evidence, the defendant cannot be retried as jeopardy attached. State v. Thompkins , 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing Tibbs v. Florida , 457 U.S. 31, 41, 47, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Even in cases where there is a reversible evidentiary error, all evidence offered by the state and admitted by the trial court, whether erroneously or not, can be considered to determine whether the evidence was sufficient to sustain the guilty verdict. State v. Brewer , 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶¶ 16-20 ; State v. Yarbrough , 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 80, citing Lockhart v. Nelson , 488 U.S. 33, 35, 38, 40-42, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). This is because the remedy for reversible evidentiary error is a new trial.
{¶46} Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. Thompkins , 78 Ohio St.3d at 386, 678 N.E.2d 541. An evaluation of witness credibility is not involved in a sufficiency review as the question is whether the evidence is sufficient if believed. Yarbrough , 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, at ¶¶ 79, 82 ; State v. Murphy , 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. See Thompkins , 78 Ohio St.3d at 390, 678 N.E.2d 541 (Cook, J., concurring).
{¶47} A conviction cannot be reversed on grounds of sufficiency unless the reviewing court determines, after viewing the evidence in the light most favorable to the prosecution, that no rational juror could have found the elements of the offense proven beyond a reasonable doubt.
*249 State v. Goff , 82 Ohio St.3d 123, 694 N.E.2d 916 (1998). See also State v. Getsy , 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998) (the question is merely whether any rational mind could find the elements were established). In viewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the state's favor. See, e.g., State v. Filiaggi , 86 Ohio St.3d 230, 247, 714 N.E.2d 867 (1999). Circumstantial evidence inherently possesses the same probative value as direct evidence. Treesh , 90 Ohio St.3d at 485, 739 N.E.2d 749.
{¶48} A person who is complicit can be prosecuted and punished as if he were a principal offender, even if the charge is stated in terms of the principal offense. R.C. 2923.03(F). A person is complicit if, acting with the kind of culpability required for the commission of an offense, he aids or abets another in committing the offense. R.C. 2923.03(A)(2). Aiding and abetting exists where the defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime * * *." State v. Johnson , 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). The culpability for the pertinent aggravated murder in this case is "purposely, and with prior calculation and design." R.C. 2903.01(A). In determining whether the defendant shared the intent of the principal, the surrounding facts and circumstances can be used to determine a defendant's intent. Treesh , 90 Ohio St.3d at 485, 739 N.E.2d 749 ; Johnson , 93 Ohio St.3d at 245, 754 N.E.2d 796.
{¶49} Appellant claims the state only proved his presence during the planning. However, there was evidence of his conduct before and after the offense showing he agreed with the plan. "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." Johnson , 93 Ohio St.3d at 245, 754 N.E.2d 796. As for aiding and abetting, he drove the shooter to the venues after the planning. To recap, there was evidence Appellant arrived at a house on Forest Avenue in Youngstown with Mike Austin (who is his brother), Dewaylyn Colvin, and R'Amel Hayes. Testimony was provided that Colvin ran a drug organization and Appellant, Austin, and Hayes worked as enforcers or shooters for the organization. Appellant was present during the planning of the shooting of a man with the last name Christian or his family members who may be at the Victory Estates housing project. The plan was expressed by Colvin, and the other three made statements giving the impression they were in agreement with the plan being expressed. Appellant was also present while hooded clothing and masks were obtained. Appellant then drove Austin, Colvin, and Hayes to the housing project as planned. Other testimony confirmed Appellant's role in the organization was a driver since he had a license and insurance.
{¶50} A resident of Victory Estates testified Hayes (her cousin) came to her apartment, spoke to Adam Christian, and exited the back door of the apartment with Christian. There was evidence Austin was waiting behind the apartment with a gun. Christian was then shot, and Hayes (who was outside with Christian) would not allow his cousin to exit when she ran to her back door. Christian died saying "Mike" shot him. (Tr. 580). With Colvin and Austin, Appellant then returned to the house on Forest Avenue where they boasted that Austin shot one of the Christians. Appellant and his brother were then provided a house to stay at after the shooting. On the way, they expressed they "served those dudes" and "put some work in" which a fellow member of the organization interpreted to mean they murdered Christian.
*250 (DVD Tr. 24-25); (Tr. 1128). They also expressed a belief the price for the killing was $10,000. Austin later confirmed how the plan proceeded.
{¶51} There was also evidence Hayes started talking about the murder, which prompted a plan to kill Hayes. There was evidence Appellant drove during this shooting as well. Austin said he initiated the shooting in the back of a vehicle and thereafter ejected the body from the vehicle. Appellant was part of the same organization as Austin and was employed as a driver and part of the team engaged in carrying out hits. His involvement in the Christian murder provided motive for the Hayes murder. A witness testified he heard Appellant and Austin complaining they did not get paid for various shootings.
{¶52} Contrary to Appellant's suggestion, a rational juror could conclude Appellant had the required culpability and assisted in the Christian and Hayes murders. As to aiding and abetting, there was evidence that Appellant cooperated with and assisted the shooter (his brother and fellow enforcer for the drug organization) in committing the offenses by driving to and from the venues for the planned killings. As to culpability, the evidence that was presented and the rational inferences that can be drawn allow one to conclude that Appellant shared Austin's criminal intent to purposely kill Christian and later Hayes with prior calculation and design.
{¶53} As aforementioned, the conclusion that a defendant shared the criminal intent of the principal can be inferred from the circumstances surrounding the crime and from the defendant's conduct before, during, and after the offense. Johnson , 93 Ohio St.3d at 245, 754 N.E.2d 796. Circumstantial evidence does not diminish the probative value of the case presented. Treesh , 90 Ohio St.3d at 485, 739 N.E.2d 749. Viewing all the evidence and rational inference in the light most favorable to the state, some rational juror could find Appellant committed aggravated murder by complicity. This assignment of error is overruled.
ASSIGNMENT OF ERROR FOUR: SPEEDY TRIAL
{¶54} Appellant's fourth assignment of error alleges:
"[T]he government failed to bring Henderson to trial timely in violation of his Sixth and Fourteenth Amendment rights to speedy trial and under the deadline of R.C. 2945.73."
{¶55} Pursuant to R.C. 2945.71(C)(2), the state must bring a felony defendant to trial within 270 days after his arrest. "[E]ach day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(E). With this triple-count provision and Appellant's incarceration in jail in lieu of bail on the pending charge, the state had 90 days during which to try this case. Appellant was not arrested on the original indictment (April 11, 2013) or on the first superseding indictment (May 16, 2013) until December 7, 2013. As Appellant pointed out below, his speedy trial time thus started on December 8, 2013 (the day after his arrest). See State v. Lawson , 7th Dist. No. 12 MA 194, 2014-Ohio-879, 2014 WL 1325751, ¶ 36 (the day of arrest is not counted). His trial commenced on April 25, 2016.
{¶56} Nevertheless, the speedy trial time is extended by periods covered in R.C. 2945.72(A) - (I). Appellant's April 1, 2016 motion to dismiss discussed some tolling events and argued tolling could not continue indefinitely when the court unreasonably delayed in ruling on his motions. In response, the state relied on arguments set forth in a prior opposition memorandum *251 filed in response to Appellant's December 2015 motion to dismiss the corrupt activity charge added in the superseding indictment.
{¶57} On appeal, Appellant does not outline the various time periods between tolling events, argue the length of each tolling event, or otherwise discuss the effect of each motion on the day count. Appellant states: when a defendant has made his prima facie speedy trial case by establishing the statutory trial time has run, then the burden shifts to the state to show the time was extended. See State v. Butcher , 27 Ohio St.3d 28, 31, 500 N.E.2d 1368 (1986) (after defendant presents a prima facie case for discharge, a burden of production arises obligating the state to produce evidence demonstrating defendant was not entitled to be brought to trial within the statutory time limits). However, the rule on the burden shifting to the state deals with the arguments presented to the trial court . It does not relieve an appellant from specifying the time and contested tolling events in his brief on appeal. Nonetheless, we will undertake our own review of the tolling events.
{¶58} Before analyzing the tolling events, some of which were discussed in Appellant's second motion to dismiss, we review Appellant's first motion to dismiss on speedy trial grounds filed in the trial court. On December 23, 2015, Appellant filed a "motion to dismiss certain counts," arguing the charges added in the second superseding indictment of May 21, 2015 were untimely if the state could have brought them at the time of the original indictment (April 11, 2013) or the first superseding indictment (May 16, 2013). Besides other counts no longer at issue, the 2015 indictment added the count charging Appellant with engaging in a pattern of corrupt activity. The defense asked the court to consider whether this count in the superseding indictment was based on facts that were different than the aggravated murder charges (in the Christian and Hayes murders), citing the Supreme Court's Adams and Homan cases. (1/28/2016 Tr. 7); (4/11/2016 Tr. 9). Appellant argued the second superseding indictment essentially related back in time for the new count and the speedy trial time ran out by the time the newest indictment was filed since the tolling motions relating to the prior charges could not be used as tolling events for the subsequent charge arising from the same facts.
{¶59} In the cited Adams case, the defendant was arrested for operating a vehicle with a prohibited alcohol concentration. Tolling the 90 days the state had to try the case, he filed three time waivers totaling 83 days and was granted a continuance for 12 days. The court then entered a nolle prosequi on the charge at the state's request. The state filed a new complaint the next day charging the defendant with operating a vehicle while under the influence based on the same set of facts as the original charge. Two months later, the defendant sought dismissal on speedy trial grounds. The Supreme Court found a speedy trial violation, concluding: "when an accused waives the right to a speedy trial as to an initial charge, this waiver is not applicable to additional charges arising from the same set of circumstances that are brought subsequent to the execution of the waiver." State v. Adams , 43 Ohio St.3d 67, 70, 538 N.E.2d 1025 (1989). The Supreme Court later explained that Adams was limited to cases involving speedy trial waivers and that waivers and tolling events are to be treated differently. State v. Blackburn , 118 Ohio St.3d 163, 2008-Ohio-1823, 887 N.E.2d 319, ¶¶ 12-23.
{¶60} In the Homan case cited in Appellant's motion, the defendant was arrested for driving under the influence and *252 driving left of center; her child was in the vehicle. She filed a speedy trial waiver and a motion to suppress. The state then charged her with child endangering. Some months later, the trial court denied the suppression motion. Prior to trial, she filed a motion to dismiss the child endangering charge. The Supreme Court considered whether R.C. 2945.72(E) (extending speedy trial time by any period of delay necessitated by the defendant's motion) could be used to extend the time on the child endangering charge. The Court concluded the tolling in division (E) did not apply to charges filed after the defendant's motion was filed. State v. Homan , 89 Ohio St.3d 421, 428, 732 N.E.2d 952 (2000). The Court subsequently suggested the Homan case should not have cited Adams to support its holding because Adams dealt with waiver and Homan dealt with tolling. Blackburn , 118 Ohio St.3d 163, 2008-Ohio-1823, 887 N.E.2d 319, at ¶¶ 20-23 (but distinguishing Homan and holding periods of delay from defense motions in a previous case apply in a subsequent case with different charges based on the same underlying facts).
{¶61} The state responded to Appellant's motion by urging the superseding indictment was timely filed and pointing to its receipt of new information about the organization and other murders, which was unknown at the time of the prior indictments. The state cited to evidence obtained in the two months before the newest indictment which led to the new charges, citing statements filed under seal. The state did not rely on pending defense motions or prior waivers filed before the superseding indictment to toll time on the new charges.
{¶62} Appellant does not maintain the argument as to the superseding indictment on appeal. In any event, there is no indication the trial court erred in overruling Appellant's argument as to the corrupt activity charge, which required evidence concerning the organization. "A later indictment is not subject to the speedy-trial timetable of an earlier indictment or arrest 'when additional criminal charges arise from facts different from the original charges, or the state did not know of these facts at the time of the initial indictment' or earlier arrest." State v. Adams , 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 84, quoting State v. Baker , 78 Ohio St.3d 108, 110, 676 N.E.2d 883 (1997). The trial court agreed the state established the superseding indictment was based upon new evidence which the state did not previously possess. It was not demonstrated that Appellant was untimely charged with an offense that was based on facts known at the time of the original charge. As reasonably concluded by the trial court, the pattern of corrupt activity charge arose from evidence discovered after the indictment for the Christian and Hayes murders. (And although Appellant was acquitted in the Slade and McCullough murders, the second superseding indictment also added Appellant as a defendant on these charges further supporting a pattern.) We note the superseding indictment argument did not apply to and would not affect Appellant's two aggravated murder convictions which were contained in the indictments filed before his arrest.
{¶63} As aforementioned, Appellant's second motion to dismiss was filed April 1, 2016. It appears the arguments within this motion are those maintained on appeal. For instance, Appellant generally contends the motions he filed would not have impeded the state from preparing for trial. However, the court need not analyze whether each motion truly or substantially diverted the prosecutor's attention or generated a continuance of the trial date in order to toll speedy trial time. "It is the *253 filing of the motion itself * * * that provides the state with an extension." State v. Sanchez , 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, ¶ 26. See also State v. Brown , 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159, ¶ 18, 26 (without considering whether the trial date was required to be continued by the motion, the Court held requests for discovery and motions for bills of particulars are tolling events).
{¶64} Again, the clock began on the pertinent aggravated murder counts on December 8, 2013, the day after his arrest. Appellant filed a request for discovery on December 17, 2013, at which point 10 days had run on the speedy trial clock. The speedy trial time is extended by "[a]ny period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused * * *." R.C. 2945.72(E). It is well established that requests for discovery and motions for bills of particulars are tolling events under this division. Brown , 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159, at ¶¶ 18, 26. The state provided some discovery the day of Appellant's request, including redacted detective notes. On December 20, 2013, the state provided autopsy reports and filed a notice of compliance which provided the court with unredacted detective notes in order to rule on a discovery dispute. The court advised it would issue a ruling by January 13, 2014 on the defendant's request for the court to conduct an in camera review of the unredacted detective notes to determine whether they should be disclosed. (12/30/13 J.E.).
{¶65} In the meantime, on December 26, 2013, Appellant filed a motion requesting the appointment of co-counsel. The court granted this motion in a January 6, 2014 judgment entry. In addition, the court held a pretrial on December 30, 2013, where Appellant moved for a continuance of the jury trial previously set for January 6, 2014. The speedy trial time is extended by "[t]he period of any continuance granted on the accused's own motion * * *." R.C. 2945.72(H). See R.C. 2945.72(C) (any period of delay necessitated by the accused's lack of counsel). In a December 30, 2013 judgment entry, the court granted Appellant a continuance and granted him leave until January 7, 2014 to file a motion on joinder and a motion regarding co-conspirators' statements.
{¶66} On January 7, 2014, Appellant filed a motion to sever and a motion for a hearing to determine whether co-conspirators' declarations can be introduced. The state filed an opposition memorandum on January 13, 2014. On that day, the court held a scheduled pretrial and issued an entry setting a motion hearing for March 28, 2014. The court's entry noted speedy trial time was tolled due to Appellant's two motions.
{¶67} On March 12, 2014, Appellant filed a motion to transcribe three video statements, which the court granted on March 17, 2014. After the March 28 motion hearing, the court's entry said the speedy trial time remained tolled, granted Appellant leave to supplement the record upon obtaining a transcript of statements of a confidential informant, and ordered the state to provide certain statements to the court within 21 days. The state filed notice of compliance on April 11, 2014. In the meantime, the parties agreed to have more transcripts produced from statements. (4/3/2014 J.E.).
{¶68} On May 1, 2014, the court severed Colvin's case from the case against Appellant and Austin, which in effect granted part of Appellant's severance motion. A June 13, 2014 judgment entry memorializing a pretrial stated the jury trial was scheduled for September 8, 2014 by agreement *254 of the parties. It also stated the parties agreed the court would conduct an in camera review of detective notes at the next pretrial on July 18, 2014.
{¶69} As Appellant pointed out in his speedy trial dismissal motion, the court did not fully rule on his January 7, 2014 severance motion until January 27, 2015. Appellant's motion argued this time should not all be tolled, noting Sup.R. 40(A)(3) provides that motions shall be ruled upon within 120 days. He urged the court should have at least decided the motion within 120 days of the March 28, 2014 hearing on the motion; under this theory, the time would be tolled on Appellant's January 7, 2014 motions until July 2014. However, as further explained below, various occurrences relevant to Appellant's motions occurred before and after this time, which extended the speedy trial time for the entire year after the motions were filed.
{¶70} Initially, we note the Rules of Superintendence set out "guidelines" for the expeditious resolution of cases. State ex rel. Culgan v. Collier , 135 Ohio St.3d 436, 2013-Ohio-1762, 988 N.E.2d 564, ¶ 8. They do not give a defendant an enforceable right. Id. Thus, Sup.R. 40(A)(3) merely assists to guide an appellate court's determination as to whether a trial court unduly delayed when ruling on a motion by showing what period is desirable for ruling. Id. at ¶ 11 (for purposes of ruling on a request for an extraordinary writ).
{¶71} A trial court's delay in deliberating and ruling on a defense motion is subject to a reasonableness standard when considering the length of tolling of the speedy trial time. State v. Caulton , 7th Dist. No. 09 MA 140, 2011-Ohio-6636, 2011 WL 6778038, ¶ 38. In assessing the reasonableness of a delay, the reviewing court considers the factors from the test applicable to the constitutional right to a speedy trial: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. Id. , citing Barker v. Wingo , 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The nature of the motion (including the complexity of the facts and legal issues) and the timing of the motion can also be considered in weighing the circumstances in assessing whether a delay in ruling was reasonable. See Caulton , 7th Dist. No. 09 MA 140, 2011 WL 6778038, at ¶ 38.
{¶72} We return to outlining the events occurring around the time Appellant believes the clock should have been restarted due to the lack of ruling on his motions. On June 30, 2014, Appellant requested an extension for filing a response to the state's notice of intent to use evidence; after the court granted an extension on July 7, 2014, Appellant asked for another extension and did not file his response until August 4, 2014, wherein he presented a motion in limine objecting to evidence. In the meantime, on July 18, 2014, the court held the in camera inspection of the detective's notes as requested by the defense, and the court ordered the September 8 jury trial to be converted to a hearing on the admissibility of certain evidence.
{¶73} The motion hearing scheduled for September 8, 2014 was continued due to a jury trial in a criminal case pending since 2009. Speedy trial time is extended by division (H) not only by "the period of any continuance granted on the accused's own motion" but also by "the period of any reasonable continuance granted other than upon the accused's own motion * * *." R.C. 2945.72(H). In addition, the state's response to Appellant's motion in limine was filed on September 16, 2014. The court then agreed to watch 15 DVDs in order to rule on the pending issues. The court's September 19, 2014 entry stated defense counsel agreed that the motion and the resulting need for the court to *255 review the videos tolled the speedy trial time. "When the parties agree to a continuance, even if it is not on the motion of the defendant, the continuance is presumptively reasonable and there is no need to explain the reason for the continuance on the record." State v. Kozic , 7th Dist. No. 11 MA 160, 2014-Ohio-3788, 2014 WL 4291627, ¶ 91. In any event, the reason for the continuance was expressed and was reasonable. See R.C. 2945.72(H).
{¶74} A November 17, 2014 hearing date was continued by agreement due to a defendant's unavailability. A pretrial was held on December 17, 2014, where the court explained its "monumental task" of listening to and reading all the statements pertinent to the in limine hearsay issue and the joinder issue; the court noted it was in the process of drafting its ruling. At this hearing, Appellant's attorney agreed: "we do agree that the filing of the motion and the court's consideration of those motions tolled the speedy trial period and we further agree that the time from today until the filing of your formal opinion is also tolled ." (Emphasis added). (Tr. 7).
{¶75} The court ruled on Appellant's evidentiary motion on January 23, 2015 and ruled on Appellant's severance motion on January 27, 2015. Considering all of the foregoing events and agreements, the court's delay in ruling on the motions was not unreasonable, and Appellant's January 7, 2014 motions tolled the time through January 27, 2015.
{¶76} Appellant's motion to dismiss on speedy trial grounds was centered around the reasonableness of the delay in ruling on the January 7, 2014 motions. Nevertheless, we briefly review the remaining occurrences to show the time was tolled from Appellant's next motion until trial commenced.
{¶77} After the court's January 27, 2015 ruling, speedy trial time began running and 15 days were added to the speedy trial clock which was previously at 10 days (for a total of 25 days). At that point, Appellant filed a motion to voir dire witnesses on February 11, 2015. As a direct result of Appellant's motion, the court continued the February 17, 2015 trial and specified that Appellant's motion was a tolling event. The jury trial was rescheduled for June 1, 2015 by agreement of the parties, and the court overruled Appellant's motion to voir dire the witnesses on March 18, 2015, at the rescheduled pretrial. In the meantime, the second superseding indictment was filed. On the day the June 1 trial was to begin, the parties agreed to a continuance, and the case was set for a July 27, 2015 pretrial at Appellant's request. (6/3/2015). The time thus remained tolled upon this agreed continuance of trial.
{¶78} Before speedy trial time could begin running, Appellant's attorneys filed a notice of a conflict of interest on June 23, 2015. A hearing was held, and on June 26, 2015, the court relieved Appellant's attorneys. Pursuant to R.C. 2945.72(C), speedy trial time is tolled by: "Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law." Replacement counsel was appointed prior to the July 27, 2015 pretrial, but a different attorney was appointed at the pretrial; this was the attorney Appellant asked the court to appoint.
{¶79} The court's entry was signed by counsel and provided, "By agreement of the parties, trial is set for January 19, 2016, at 8:30 a.m. Due to the amount of discovery and potential pleadings to be filed still, speedy trial time is tolled until trial." (Emphasis added). (7/27/2015 J.E.).
*256 It is not contested that this was an agreed continuance and/or a period of delay agreed to be necessitated by the appointment of new counsel. Time remained tolled after the appointment of new counsel through this trial date, and additional events kept the time tolled until trial.
{¶80} Before this new trial date, Appellant filed the aforementioned motion dismissing certain counts (containing the arguments about the superseding indictment); this was overruled in a February 16, 2016 judgment entry. Also before the scheduled trial, Appellant filed a January 7, 2016 notice informing the court that he concurred with the motion to continue filed by co-defendant Austin. The court granted the continuance, resetting the trial, by the agreement of the parties, to February 16, 2016. (1/11/2016 J.E.). Appellant jointly-requested a continuance of this trial date at the February 12, 2016 pretrial. The court granted the continuance and reset the trial for April 25, 2016, by agreement of the parties. (2/16/2016 J.E.). Trial did commence on that date.
{¶81} Contrary to the argument specified in the April 1, 2016 speedy trial motion, the totality of the circumstances support a holding that the trial court did not unreasonably delay in ruling on Appellant's motion to sever, motion for a hearing on co-conspirator's statements, and motion in limine. Appellant's statutory speedy trial rights were not otherwise violated.
{¶82} Appellant also briefly mentions the constitutional right to a speedy trial. A balancing test is used to analyze constitutional speedy trial claims, focusing on four factors: (1) the length of the delay; (2) the reason for the delay; (3) how and when the defendant asserted his right to a speedy trial; and (4) whether the defendant suffered prejudice from the delay. Barker , 407 U.S. at 530-532, 92 S.Ct. 2182 ; State v. Taylor , 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶¶ 38-39. Appellant asserted his rights in a motion three weeks prior to trial; and made superseding indictment arguments three months earlier. The length of delay between Appellant's arrest and the commencement of trial was less than 2.5 years. The reasons for the delay and various tolling events were discussed supra. Appellant has not demonstrated prejudice from the delay. As the balancing test does not weigh in Appellant's favor, he has not established his constitutional right to a speedy trial was violated. This assignment of error is overruled.
ASSIGNMENT OF ERROR FIVE: CUMULATIVE ERROR
{¶83} Appellant's final assignment of error states:
"[E]ven if each of the foregoing errors is not reversible, the errors combined created a manifest miscarriage of justice."
{¶84} Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." State v. Clinton , 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 247, quoting State v. Powell , 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. Even where multiple errors occur, they do not "become prejudicial by sheer weight of numbers." Id. at ¶ 248 (finding multiple harmless errors but concluding the record showed the cumulative effect of the errors did not deprive the defendant of a fair trial in light of the significant evidence against him), quoting State v. Hill , 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996) (the Constitution *257 does not guarantee an error-free trial).
{¶85} The errors Appellant refers to here are "the joinder problem" addressed in the second assignment of error and "the Sixth Amendment forfeiture-by-wrongdoing problem" addressed in the first assignment of error. He describes these as "striking, palpable, and psychologically jarring errors." If this court finds errors as to both issues, but finds each harmless, then Appellant concludes their combined effect renders the verdict questionable. He notes there was no physical evidence linking him to the homicides and contrasts this to a case where this court found cumulative error even though there was physical evidence linking the defendant to the offense. See State v. Anderson , 7th Dist. No. 03 MA 252, 2006-Ohio-4618, 2006 WL 2573785, ¶ 84 (even if the errors in admitting testimony on prior acts of sexual aggression and probation violations were individually harmless, they were cumulatively prejudicial).
{¶86} As this court found no errors under the first or second assignments of error, Appellant's cumulative error argument is moot. Based on the conclusions above, this assignment of error is overruled.
{¶87} For the foregoing reasons, the trial court's judgment is affirmed.
Donofrio, J., concurs.
Bartlett, J., concurs.

Austin was found guilty of all four aggravated murders (and not guilty of the attempted murder or felonious assault of the person who may have been shot as vengeance for a burglary).

It has also been observed: "the reasons why a defendant forfeits his confrontation rights apply with equal force to a defendant whose coconspirators render the witness unavailable, so long as their misconduct was within the scope of the conspiracy and reasonably foreseeable to the defendant, as it was here. Suppose several individuals enter into a conspiracy, and, as part of the conspiracy, they agree to kill all potential witnesses against them. All members of the conspiracy would be criminally responsible for the resulting murder of a witness, * * * and there is no good reason why the murder should give any of them an evidentiary advantage * * * That there is no direct evidence of an explicit agreement to kill adverse witnesses in this case is of no moment. The evidence was more than sufficient to infer the existence of such an agreement and to conclude that [the witness's] murder was in furtherance of the conspiracy and reasonably foreseeable." United States v. Carson , 455 F.3d 336, 364 (D.C.Cir.2006)