[Cite as *State v. Donlow*, 2022-Ohio-1518.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

BRIAN DONLOW, JR.,

Defendant-Appellant.

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MA 0046**

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 19 CR 19B

**BEFORE:**
Carol Ann Robb, Gene Donofrio, Cheryl L. Waite, Judges.

**JUDGMENT:**
Affirmed.

*Atty. Paul J. Gains,* Mahoning County Prosecutor, *Atty. Ralph M. Rivera,* Assistant Chief, Criminal Division, Mahoning County Prosecutor's Office, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee and

*Atty. Joseph W. Gardner*, 1396 NE River Road, Lake Milton, Ohio 44429, for Defendant-Appellant .

Dated: May 5, 2022

**Robb, J.**

{¶1} Defendant-Appellant Brian Donlow, Jr. appeals the judgment of the Mahoning County Common Pleas Court entered after a bench trial convicting him of aggravated murder, attempted aggravated murder, and having a weapon while under disability. Appellant contests the trial court's decision to admit the attempted murder victim's statements under the forfeiture by wrongdoing hearsay exception after this witness refused to testify while on the stand. It is alleged the state failed to present sufficient evidence to prove the witness's unavailability was caused by Appellant's wrongdoing. It is also claimed the court should have recalled this witness during the admissibility hearing in order to confirm what the victim told prosecutors as to why he refused to testify. For the following reasons, the trial court's judgment is affirmed.

## STATEMENT OF THE CASE

{¶2} On November 18, 2018, Christopher Jackson was killed as he sat in the front passenger seat of a vehicle in Youngstown. He was shot nine times from behind. The driver, Carlos Davis, survived after suffering two gunshot wounds. A January 2019 indictment named Stephon Hopkins and Lorice Moore as the perpetrators.

{¶3} On October 17, 2019, a superseding indictment was filed to add Appellant Brian Donlow, Jr. as a defendant. Appellant was charged with: aggravated murder (and murder) in the death of Christopher Jackson; attempted aggravated murder (as well as murder and felonious assault) in the shooting of Carlos Davis; firearm specifications; and having a weapon while under disability (due to a 2014 conviction for felonious assault).

{¶4} On December 23, 2020, Appellant filed a pro se motion seeking to remove his attorney and to waive his right to counsel. He also voiced this request at hearings on January 19, 2021 and February 11, 2021. The court explained a hearing would be set to ensure the waiver of counsel was proper. Appellant then filed a pro se motion seeking to waive his right to a jury trial.

{¶5} At the next hearing, the court addressed Appellant's request to waive counsel as required by Crim.R. 44(C) and made advisements and inquires on his request to represent himself. *See Iowa v. Tovar*, 541 U.S. 77, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004); *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *State*

*v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 102. The court found Appellant knowingly, intelligently, and voluntarily waived his right to counsel pursuant to Crim.R. 44(A). (2/25/21 Tr. 47). Defense counsel was appointed as stand-by counsel.

{¶6} After further inquiry, the court also found Appellant knowingly, intelligently, and voluntarily waived his right to a jury trial as required by Crim.R. 23(A). (2/25/21 Tr. 56). The court filed the signed waivers after reviewing them with Appellant. (2/26/21 J.E.). Appellant's case was severed from the case against the other two defendants who maintained their right to a jury trial.

{¶7} At the hearing, Appellant also verbally withdrew a motion to suppress a lineup. (2/25/21 Tr. 57). His written request to withdraw that motion explained the evidence was favorable to his defense because Mr. Davis could not identify him at the lineup; Appellant also disclosed he wanted to wait until trial to see Mr. Davis.

{¶8} On April 27, 2021, a two-day bench trial commenced. Appellant represented himself. Carlos Davis refused to testify when called to the stand. He was appointed an attorney and thereafter held in contempt and sentenced to the maximum sentence of thirty days in jail (to run consecutive to a prison term he was serving). (Tr. 49-62). This prompted the state to file a notice of intent to use evidence under the forfeiture by wrongdoing hearsay exception. A hearing on the motion was held the next day. A prosecutor testified about the explanation he was given by Mr. Davis as to his refusal to testify. (Tr. 170-176). Over Appellant's objection, the court ruled the detective could testify about the statements Mr. Davis made to him. (Tr. 177-183).

{¶9} Before this trial testimony, a dispatch supervisor identified a disk containing two 911 calls which were played for the court. (Tr. 232) (St.Ex. 2). A female called 911 at 1:52 a.m. to report she heard gunshots and saw two people run from Bennington Avenue toward Stewart Avenue. At that intersection, the caller saw a vehicle parked in a yard with the headlights on and the doors open. A man called 911 at 1:56 a.m. to report he heard two gunshots and then found the shooting victim on the porch of his house on Stewart Avenue.

{¶10} The first responding police officer found Carlos Davis sheltering on the front porch in fear and extreme pain. (Tr. 67, 72). The paramedic testified Mr. Davis suffered two gunshot wounds to the right upper back, had trouble breathing, and was in pain. (Tr. 223). Mr. Davis had $45 on his person. (Tr. 93). His wrecked vehicle was found two addresses down in an empty lot on Bennington Avenue; tracks showed the vehicle traveled off the road. (Tr. 68, 80).

{¶11} Christopher Jackson's body was in the passenger seat. The forensic pathologist described that most of the victim's nine gunshot wounds were located on the head and neck; he was also hit in the left back and right shoulder. (Tr. 195-215). The trajectory of the wounds showed he was shot from behind. (Tr. 208). Projectiles were recovered from the decedent's body (and one was recovered from the floor by his feet).

{¶12} The crime scene officer took photographs showing the front driver's side was also subjected to gunfire. The driver's door had bullet holes showing the bullets were fired from the inside, and two projectiles were recovered from the driver's side (one on the floor and one lodged between the windshield and dashboard). (Tr. 82-83, 89).

{¶13} Multiple fired shell casings were found from three weapons. Two .380 caliber Winchester casings were recovered (from the victim's seat after the body was moved and the rear seat). (Tr. 82, 87-88, 122). Two .22 caliber casings were found (on the rear driver's side floor and on the rear seat). (Tr. 87). Four .40 caliber casings were recovered in and around the vehicle (such as under the rear portion of the passenger seat and on the ground, both that night and the next day while doing a daylight assessment). (Tr. 85). The decedent's father said he saw a casing on the ground the next day when visiting the scene. (Tr. 40).

{¶14} A fifth .40 caliber casing and a blood trail were discovered at the end of the driveway of the house where Mr. Davis took shelter. (Tr. 85-86). The police concluded the gunfire inside the vehicle originated in the back seat from three semi-automatic weapons of different calibers and a shooter pursued Mr. Davis on foot after he ran from the vehicle. (Tr. 230-232).

{¶15} A BCI forensic scientist testified the casings of matching calibers were fired from the same weapon and a different weapon ejected each of the three calibers of

casings. (Tr. 140-141, 145). As to recovered projectiles, the four .40 caliber bullets were fired from the same weapon, the .22 caliber bullets were too damaged to compare, and the sole .380 bullet could not be compared. (Tr. 141).

{¶16} The detective testified he spoke to Mr. Davis in the hospital before surgery. Mr. Davis could not say which of the rear passengers had guns; he told the detective he heard gunfire, felt himself get hit, jumped out of the car, and felt himself get hit again. (Tr. 265). Mr. Davis provided information allowing the detective to identify the decedent (e.g., the decedent left his vehicle at a house associated with Mr. Davis). (Tr. 233). Mr. Davis also mentioned a person with whom the decedent had been incarcerated. The decedent's father testified his son had been transferred between juvenile facilities because an inmate caused him problems. (Tr. 33-34, 39-40).

{¶17} According to the detective's testimony, Mr. Davis later researched the decedent's Facebook friends and identified Stephon Hopkins as the person who sat behind the driver's seat in the vehicle. (Tr. 239). The detective confirmed Stephon Hopkins had been incarcerated at the juvenile facility at the same time as the decedent. (Tr. 241).

{¶18} After obtaining warrants for phone and Facebook records, the detective learned Stephon Hopkins communicated with the decedent before the shooting, asking to be picked up at Rockford Village. (Tr. 243-244, 258-259). The detective also learned that Stephon Hopkins called for a taxi at an address in Rockford Village after the shooting (but the taxi did not accept the 4:44 a.m. request). (Tr. 248-249). Mr. Davis drove with the detective to confirm this was the location where he picked up the three suspects. (Tr. 257-258).

{¶19} A search warrant was executed at the house where Stephon Hopkins resided, an address also associated with Appellant. (Tr. 245). Along with paperwork in the name of Stephon Hopkins, the police discovered ammunition of the same caliber and make as the .380 caliber casings found in the vehicle. (Tr. 97-99, 246). The detective was able to unlock the back door of the house with the key from a keychain recovered from the rear floor of the vehicle after the shooting. (Tr. 248). A BCI forensic scientist matched DNA from the key with Stephon Hopkins. (Tr. 91, 125-126).

{¶20} Mr. Davis was presented with photo line-ups of known associates or relatives of Stephon Hopkins. Mr. Davis identified Lorice Moore as the passenger-side rear seat occupant. (Tr. 251). A BCI forensic scientist matched Lorice Moore's DNA with the sample recovered from both the exterior and the interior handle of the rear passenger door. (Tr. 124).

{¶21} Mr. Davis did not identify Appellant's photograph in a line-up. (Tr. 252-253). The detective testified Mr. Davis called him weeks later, after researching Facebook photographs again. He told the detective he was confident Appellant was the third suspect, the one who sat in the middle rear seat. (Tr. 254). Appellant's Facebook photos were admitted as exhibits. The detective also provided evidence showing Appellant was disqualified from carrying a firearm. (Tr. 256).

{¶22} On cross-examination, the detective acknowledged Appellant was over six-feet tall and would be considered closer to dark-skinned, whereas Mr. Davis initially described the person in the middle rear seat as "light-skinned and five foot something." (Tr. 261-265). It was pointed out the cited interview took place in the hospital the day after the shooting with Mr. Davis appearing unwell, unsure, and sedated. (Tr. 283-284).

{¶23} After the state rested, Appellant presented no evidence. The court found Appellant guilty as charged and imposed a sentence of life without parole for aggravated murder plus 3 years for a firearm specification. The court also imposed a consecutive sentence of 11 years for attempted aggravated murder and a concurrent sentence of 36 months for having a weapon while under disability. (5/13/21 J.E.). The within timely appeal followed.

ASSIGNMENT OF ERROR ONE

{¶24} Appellant's first assignment of error provides:

"The unavailability of the witness, Carlos Davis, was not due to any wrongdoing of the defendant-appellant, Brian Donlow."

{¶25} The circumstances behind Mr. Davis' refusal to testify when called to the stand prompted the state to file a notice of intent to use evidence. The state asked the court to permit the detective to testify about the statements made to him by Mr. Davis under the forfeiture by wrongdoing hearsay exception under Evid.R. 804(B)(6) based on

the allegation that Mr. Davis refused to testify because he was threatened by Appellant while in prison.

**{¶26}** At the admissibility hearing, one of the two prosecutors representing the state said he was prepared to testify as to his conversation with Mr. Davis if Appellant objected to the detective presenting hearsay under the cited exception. (Tr. 162). Appellant did object, noting he was able to prepare his response the night before the hearing. (Tr. 163). Appellant complained the attorney for Mr. Davis did not mention the reason for the refusal to testify, the prosecutor's testimony about what Mr. Davis said after refusing to testify would be hearsay, and there was thus no evidence about a threat. (Tr. 163-166).

**{¶27}** The trial court found Mr. Davis was unavailable, reciting the prior events surrounding his refusal to testify, and found the state's notice was timely. (Tr. 166-167, 181-182). The court explained the Rules of Evidence did not apply to the admissibility hearing and thus the state could use hearsay to lay the foundation for the forfeiture by wrongdoing hearsay exception. (Tr. 167). *See* Evid.R. 104(A) (in ruling on preliminary admissibility questions, the court "is not bound by the rules of evidence except those with respect to privileges"); Evid.R. 101(C)(1) ("These rules (other than with respect to privileges) do not apply in the following situations: (1) Admissibility Determinations. Determinations prerequisite to rulings on the admissibility of evidence when the issue is to be determined by the court under Evid.R. 104.").

**{¶28}** After hearing the prosecutor's testimony on Mr. Davis' situation, the trial court found the state met the burden to show the elements of the hearsay exception by a preponderance of the evidence and allowed the detective to testify about Mr. Davis' statements to him (recited in our Statement of the Case above). Appellant contests the decision to permit this hearsay under the forfeiture by wrongdoing exception. Before reviewing the evidence presented by the prosecutor at the admissibility hearing, we review the pertinent law.

**{¶29}** "[E]ven when confrontation rights apply, testimonial hearsay can be admitted under the common law forfeiture by wrongdoing exception (also called wrongful procurement of unavailability doctrine). *State v. Henderson*, 2018-Ohio-5124, 125 N.E.3d

235, ¶ 20 (7th Dist.). "Forfeiture by wrongdoing has long been recognized as an equitable exception to a defendant's constitutional right to confront the witnesses against him." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 96, citing *Giles v. California*, 554 U.S. 353, 366, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) and *Reynolds v. United States*, 98 U.S. 145, 158, 25 L.Ed. 244 (1878). Case law has "explicitly preserved the principle that an accused has forfeited his confrontation right where the accused's own misconduct is responsible for a witness's unavailability." *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 105, citing *Crawford v. Washington*, 541 U.S. 36, 43, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("The rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be alternative means of determining reliability.").

**{¶30}** Evid.R. 804(B)(6) "was promulgated to encompass this forfeiture principle." *Henderson*, 2018-Ohio-5124 at ¶ 21, citing *McKelton*, 148 Ohio St.3d 261 at ¶ 96. Pursuant to Evid.R. 804(B)(6), the forfeiture by wrongdoing hearsay exception permits the admission of a "statement offered against a party if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying."

**{¶31}** Therefore, "a prosecutor must show by a preponderance of the evidence that (1) the defendant engaged in wrongdoing that caused the witness to be unavailable and (2) one purpose for the wrongdoing was to make the witness unavailable to testify." *McKelton*, 148 Ohio St.3d 261 at ¶ 96. A preponderance of the evidence merely means "the existence of the fact sought to be proved is more likely than its nonexistence." *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, ¶ 54 (as opposed to the higher standard of clear and convincing evidence, which must produce a "firm belief or conviction" in the mind of the factfinder).

**{¶32}** The forfeiture exception applies to defendants who "seek to undermine the judicial process by procuring or coercing silence from witnesses * * *." *Davis v. Washington*, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Obtaining the witness's silence need not be the sole motivation. *State v. Hand*, 107 Ohio St.3d 378,

2006-Ohio-18, 840 N.E.2d 151, ¶ 84, 90. The type of wrongdoing covered by the rule goes beyond murder or physical assault of the witness; in fact, "the wrongdoing need not consist of a criminal act." *Henderson*, 2018-Ohio-5124 at ¶ 21, quoting 2001 Staff Note to Evid.R. 804(B)(6). A defendant's intentional procuring of a witness's unavailability may be performed by others acting on his behalf or as part of a conspiracy. *Id.* at ¶ 24.

**{¶33}** Appellant argues the state did not sufficiently show Mr. Davis' refusal to testify was due to Appellant's wrongdoing, as the state did not specifically demonstrate what the alleged threat was and thus whether the threat constituted wrongdoing. In the reply brief, Appellant points to the following answer of the prosecutor when Appellant asked him to repeat why Mr. Davis was scared: "he said that this shit was already going on upon his entry to ODRC, and that he was threatened by you, Stephon Hopkins – he felt threatened by you, Stephon Hopkins and Lorice Moore." (Tr. 174). Appellant says the prosecutor changed "was threatened" to "felt threatened" within the answer and thus only testified that Mr. Davis felt threatened.

**{¶34}** We initially note a reply brief is not the place for making new arguments. *See State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 18. In any event, the prosecutor's answer was a recap and did not eliminate the prior recitation on what Mr. Davis was willing to disclose about what happened in prison. We evaluate the prosecutor's statements in their entirety and in the context of the situation before the trial court. *See State v. Henderson*, 7th Dist. Mahoning No. 16 MA 0057, 2019-Ohio-130, ¶ 12. Circumstantial evidence has the same value as direct evidence, and rational inferences are viewed in the state's favor. *Id.*, citing *Henderson*, 2018-Ohio-5124 at ¶ 32.

**{¶35}** The state's notice of intent to use evidence pointed out Mr. Davis had been a prison inmate since April 10, 2020 and was mistakenly placed in the same facility where Appellant was being held. When this issue was discovered, the state communicated with the Ohio Department of Rehabilitation and Correction and the placement was corrected in November 2020. Attorney Yacavone's testimony confirmed Mr. Davis was sentenced to prison by a court in Trumbull County and was inadvertently placed in the same prison as Appellant despite an order not to do so. (Tr. 171). He viewed November 2020 emails

showing the prison corrected the situation after the prosecutor's office learned of it. (Tr. 171-172).

{¶36} Attorney Yacavone explained how he and the other prosecutor on the case spoke to Mr. Davis immediately after Mr. Davis was brought to the jury room by two deputies (after he announced from the stand he was pleading the Fifth Amendment). Attorney Yacavone testified Mr. Davis "made it very clear that he is in self-preservation mode, that there is nothing we can do or say to make him testify, and that all he was doing is setting himself up to be harmed." When the prosecutors asked what happened, Mr. Davis disclosed, "this shit already started when I went to * * * prison." He was asked, "who is getting to you. Who are you scared of?" Mr. Davis answered, "all three." (Tr. 172). Attorney Yacavone said he took this to mean the three defendants in this case. (Tr. 173).

{¶37} He said Mr. Davis feared his life was in danger if he testified and "made it very clear to us that Mr. Donlow was already serving a life sentence, and that his life is not worth a second life sentence on Mr. Donlow." (Tr. 173). On cross-examination, Appellant asked why Mr. Davis was scared, and Attorney Yacavone answered: "he said that this shit was already going on upon his entry to ODRC, and that he was threatened by you, Stephon Hopkins – he felt threatened by you, Stephon Hopkins and Lorice Moore." (Tr. 174).

{¶38} The state demonstrated the location and timeframe of the alleged threatening conduct. Mr. Davis was mistakenly placed in the same prison as Appellant despite an order against such placement and was imprisoned with him for more than six months. The trial court was in the best position to judge the prosecutor's credibility and find the prosecutor accurately recited the disclosure he heard Mr. Davis make as to why he was refusing to testify after previously cooperating in multiple ways. For instance, he was active in investigating various facts (such as his independent scouring of Facebook and reporting his findings to the detective).

{¶39} The trial court witnessed the demeanor of Mr. Davis as he took the stand and refused to answer questions posed by the prosecution and the court. The court viewed his demeanor again when he returned to the courtroom after consultation with an

attorney (discussed further in the next assignment of error). As the court pointed out, Mr. Davis was clearly in fear while refusing to answer the most basic questions and stating he pled the Fifth Amendment. We note the witness was aware Appellant was representing himself and would be questioning him directly. We also note after asking to represent himself and in a pro se motion to withdraw his attorney's suppression motion, Appellant admitted he wanted the trial to be his first courtroom encounter with Mr. Davis.

{¶40} After being in the courtroom with Appellant and voicing his refusal to testify, Mr. Davis briefly spoke to the prosecutors. He exhibited more fear after leaving the stand. He reasoned the threat to his own life was not outweighed by the likelihood Appellant would be acquitted of this crime without his testimony. He even referred to the fact that Appellant was already serving a life sentence (in another murder case). Mr. Davis specifically said he would be harmed if he testified while explaining "this shit" began when he was first placed in prison. The threat of harm was clearly connected to his testimony in this case. He attributed his fear and the conduct to "all three" which is rationally interpreted to refer to the three defendants indicted together (whom he identified as the three back seat passengers). *See Henderson*, 2019-Ohio-130 at ¶ 12 (where the defendant complained on reconsideration that the declarant provided a "misty" reference to "they" when disclosing the threat, we pointed out this reference was made in the context of discussing the trial of Appellant and his co-defendant and we referred to the inherent value of circumstantial evidence and rational inferences).

{¶41} Again, the entire context can be considered with all rational inferences recognizing the victim's disclosures were made in a rushed manner after he hurried off the stand where he refused to testify while Appellant was representing himself. Considering the totality of the facts and circumstances, the preponderance of the evidence supported the conclusion that Appellant procured the victim's refusal to testify with threats to the victim's life and thus the victim's unavailability was due to Appellant's wrongdoing with purpose to make the witness unavailable to testify. The first assignment of error is overruled.

<u>Rule of Professional Conduct 3.7</u>

**{¶42}** Appellant's brief complains about the trial court's statement: "Attorney Yacavone did state that he would be willing to testify. I think he will have to do so." (Tr. 167). We note this was in response to Appellant saying there was no evidence Mr. Davis had been threatened; the court was explaining the state did not yet have the opportunity to present evidence about the threat in order to meet its burden as to the hearsay exception. Appellant alleges the trial court encouraged and permitted a violation of Professional Conduct Rule 3.7.

**{¶43}** Prof.Cond.R. 3.7(c) provides, "A government lawyer participating in a case shall not testify or offer the testimony of another lawyer in the same government agency, except where division (a) applies or where permitted by law." The cited division (a) states: "A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless one or more of the following applies: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; (3) the disqualification of the lawyer would work substantial hardship on the client." Prof.Cond.R. 3.7(a).

**{¶44}** Initially, we note "violations of the Rules of Professional Conduct have no bearing on the admissibility of evidence." *State v. Montgomery*, 8th Dist. Cuyahoga No. 99452, 2013-Ohio-4193, 997 N.E.2d 579, ¶ 36. An alleged violation of Prof.Cond.R. 3.7 does not equate to a violation of an evidentiary rule requiring an order of exclusion on appeal. *See State v. Oteng*, 10th Dist. Franklin No. 19AP-763, 2020-Ohio-6939, ¶ 19, citing *State v. White*, 4th Dist. Vinton No. 19CA715, 2019-Ohio-4562, 148 N.E.3d 12, ¶ 32.

**{¶45}** Next, we point out the prosecutor did not testify as a witness at trial for purposes of providing evidence on the merits but presented information by testifying *at an admissibility hearing*. The evidence was being provided to the judge, and there was no risk of confusion (as is possible when a prosecutor is called to testify before a jury at trial). *See* Comment to Prof.Cond.R. 3.7.

**{¶46}** To show a witness has been intimidated into refusing to testify, it is often the prosecutor trying the case who is informed by a witness of an intimidation issue.

Prosecutors commonly inform the trial court of events of which they have personal knowledge that bear on the issue of admissibility.  For instance, we upheld the use of the forfeiture by wrongdoing exception in a case where (among other facts) a witness met with the two prosecutors to prepare for trial and one of the prosecutors later texted the witness to remind him about the court date.  When the witness failed to appear, the prosecutor told the court he received texts from the witness saying:  "They say if I go they're going to kill my family, so what do I do? I should kill myself" and "Not running from you. They going to kill my family."  *State v. Henderson*, 7th Dist. No. 16 MA 0057, 2018-Ohio-5124, 125 N.E.3d 235, ¶ 25.  We further note, in the case at bar, the prosecutors did not begin the trial knowing they were likely to be witnesses to the victim's mid-trial disclosure about why he refused to testify when called to the stand.

**{¶47}**  Moreover, pursuant to Prof.Cond.R. 3.7(a)(3), disallowing the prosecutor's testimony would have caused a substantial hardship on the state.  We point to the next section for a discussion on the victim's refusal to testify on any subject related to this trial.  Without evidence of the victim's disclosure on being threatened, the victim's identification of Appellant as a rear seat occupant would have been excluded as hearsay by the trial court.  Under the plain language of the rule, division (a)(3) is an exception to division (c).

**{¶48}**  Appellant suggests the prosecution could have avoided the use of a prosecutor's testimony by instead questioning one of the deputies who escorted Mr. Davis to the jury room after he refused to testify.  Yet, there is no indication the deputies were listening to the conversation between the prosecutors and the witness.  In any event, Appellant did not raise this suggestion below; nor did Appellant argue to the trial court that it was improper to allow the prosecutor to testify under a rule of professional conduct.  His argument regarding the prosecutor's testimony involved credibility, a desire to confirm what Mr. Davis told the prosecutors by recalling Mr. Davis (which is addressed in the next assignment of error), and the hearsay nature of the prosecutor's testimony.  In sum, the argument under Prof.Cond.R. 3.7 is without merit.

ASSIGNMENT OF ERROR TWO

**{¶49}**  Appellant's second assignment of error contends:

"The court should have allowed the defendant to subpoena and question Carlos [Davis] before allowing hearsay evidence."

**{¶50}** When Mr. Davis was initially called to the stand, he provided his name but when asked his age, he answered, "I plead the Fifth." He gave the same answer when asked whether he was in custody and whether he had an attorney. (Tr. 49-50). The court then appointed an attorney for Mr. Davis, noting the unclear connection with the questions and his Fifth Amendment rights. The state agreed there was no intent to elicit information on criminal activity by the witness but merely to inquire about his status as a victim in the case. (Tr. 56-57). After consultation with Mr. Davis, the appointed attorney said Mr. Davis was maintaining his refusal to answer questions even after being counseled on Fifth Amendment principles and the risk of being held in contempt.

**{¶51}** As set forth above, the court held a hearing the next day to determine if the forfeiture by wrongdoing hearsay exception applied to allow the detective to testify to the statements made by Mr. Davis. After Attorney Yacavone testified about the reasons Mr. Davis refused to testify, Appellant asked the court if Mr. Davis could be called back to testify about what he told Attorney Yacavone. (Tr. 178).

**{¶52}** The prosecutor pointed out hearsay was admissible at the hearing and emphasized how the witness made it clear to the court that he would refuse to answer any questions in this case. Appellant said he did not want to ask Mr. Davis about the shooting and claimed Mr. Davis' refusal to testify pertained to the shooting (not to the topic of threats while incarcerated). (Tr. 178-179). The court denied Appellant's request to recall Mr. Davis to see if he would answer questions on his disclosures to the prosecutors about threats.

**{¶53}** Appellant contends the denial of this request violated his Sixth Amendment right to confront and subpoena witnesses. He concludes the case should be remanded for a new trial where he can ask Mr. Davis questions relevant to Evid.R. 804(B). In support, Appellant points to the court's final question, which Mr. Davis answered in the affirmative: "is it true and correct that you will refuse to answer any and all questions put forth to you by the State of Ohio this morning or at a future hearing regarding this case, State versus Brian Donlow?" (Tr. 60). Appellant emphasizes the court only included

"questions by the State of Ohio" in its query and did not ask if Mr. Davis would also refuse to answer questions from the court or the defendant, suggesting there was no showing Mr. Davis would refuse to answer questions from the court or from the defense.

**{¶54}** However, the contents of this particular question were not shown to be significant, and no support is provided for the argument. The fact a court modified "any and all questions" with "by the state" when confirming whether the state's witness would refuse to answer questions in the case does not show this witness should be recalled for an admissibility hearing to answer the pro se defendant's questions. As recognized in Appellant's conclusion, both sides must be able to question a witness. If the state's questions would not be answered, then the witness was unavailable.

**{¶55}** In any event, Mr. Davis' attorney had already set forth the specifics of Mr. Davis' broad refusal on the record. His attorney initially said: "it's his intention at this time to still assert the Fifth Amendment right, or otherwise refuse to answer any questions the court has." He further stated that regardless of the Fifth Amendment's application and the risk of contempt, Mr. Davis "will not answer any questions that are inquired *by the state, by the court or by the defendant*." (Emphasis added.) (Tr. 56).

**{¶56}** Subsequently, the attorney reiterated without qualification: "my client will not answer any questions. He will invoke his Fifth Amendment right. But regardless of what the court's finding is, he nevertheless will not answer any questions." (Tr. 59). The attorney asked Mr. Davis if this recitation was accurate, and upon being prompted by counsel to provide his answer out loud, Mr. Davis responded, "Yes, sir." (Tr. 59-60). Notably, the witness's refusal to testify was not solely about questions related to the shooting. This can be seen by the statements made by his attorney, the question asked by the court, and the general context, including the fact that Mr. Davis would not even answer the questions on his age, whether he had an attorney, or whether he was in custody.

**{¶57}** Regarding Appellant's mention in his brief of the right to subpoena a witness, the court advised Appellant two weeks prior to trial that there was a certain process for subpoenaing witnesses and a mere request was not sufficient. The court noted the procedure was an example of why it was important to have legal representation

as opposed to proceeding pro se. (4/13/21 Tr. 3). In any event, Appellant did not attempt to subpoena Mr. Davis. The state secured Mr. Davis' presence at trial by securing a warrant for his removal from prison. At the mid-trial admissibility hearing held the day after Mr. Davis refused to testify, Appellant asked the court to recall the witness so Appellant could question him about whether Appellant threatened him. Regardless of whether Appellant had subpoenaed Mr. Davis, this witness had already refused to testify.

**{¶58}** As reviewed above, this refusal was clearly established while the witness was on the stand. The record sufficiently demonstrated that Mr. Davis would refuse to answer any questions during this case whether asked by the state, the court, or the defendant. The court's refusal to recall the witness for the admissibility hearing was not error. This assignment of error is overruled.

**{¶59}** For the foregoing reasons, the trial court's judgment is affirmed.


Donofrio, P J., concurs.

Waite, J., concurs.

[Cite as *State v. Donlow*, 2022-Ohio-1518.]

—————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**