# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

MELANIE BRADO,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 BE 0039**

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 20 CR 229

**BEFORE:**
Cheryl L. Waite, David A. D'Apolito, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. J. Kevin Flanagan,* Belmont County Prosecuting Attorney and *Atty. Jacob A. Manning,* Assistant Prosecuting Attorney, 52160 National Road, St. Clairsville, Ohio 43950, for Plaintiff-Appellee

*Atty. Katherine E. Rudzik*, 26 Market Street, Suite 904, Youngstown, Ohio 44503, for Defendant-Appellant.

Dated: March 30, 2023

---

**WAITE, J.**

{¶1} Appellant Melanie Brado appeals a September 22, 2021 judgment entry of the Belmont County Court of Common Pleas convicting her of several drug related offenses. Appellant challenges a search warrant and supporting affidavit, and the sufficiency and weight of the evidence produced against her at trial. She also argues that the court improperly ordered her sentences to run consecutively. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

<u>Factual and Procedural History</u>

{¶2} This matter began as a simple traffic stop that did not involve Appellant. In that incident, Z.D. was operating a vehicle under a suspended license, prompting Officer Michael Duplaga to initiate a traffic stop of the vehicle. During the encounter, Officer Duplaga discovered a hypodermic needle he believed constituted drug paraphernalia. The record is not clear as to how Z.D. then became a confidential informant. At trial, Officer Duplaga testified that Z.D. asked him whether he could avoid criminal charges if he assisted law enforcement in pursuing larger drug targets. An affidavit in support of a later search warrant states that Z.D. offered to become a confidential informant. However, Officer Duplaga testified at the suppression hearing that he offered Z.D. the opportunity to become a confidential informant, and told Z.D. his cooperation would make his charges "disappear." (Compare Motion to Suppress Hr., p. 13; Trial Tr., p. 192.) Regardless, Z.D. signed a confidential informant agreement and immediately assisted law enforcement in an investigation.

**{¶3}** In what appears to be Z.D.'s second investigation assisting law enforcement, the record again contains conflicting testimony from Officer Duplaga. At a suppression hearing, Officer Duplaga testified that Z.D. approached him and named Benjamin Cutlip and Appellant as potential targets. (Motion to Suppress Hrg., pp. 21-22.) At trial in the matter, Officer Duplaga testified that he initiated contact with Z.D. and asked him if he knew Cutlip. According to Officer Duplaga, Z.D. knew Cutlip from a prior incarceration at the Belmont County Jail. (Trial Tr., p. 195.) In either event, Z.D. agreed to conduct a controlled buy from Cutlip.

**{¶4}** David Wise provided testimony at trial regarding the location of the controlled buy. Wise owns a significant amount of land in Belmont County and rents trailer and camper spaces on his property for residential purposes. In June of 2021, Appellant called Wise and asked about renting a spot to park a residential trailer. (Trial Tr., p. 169.) According to Wise, Cutlip accompanied Appellant to the site and brought what is referred to as a five-wheel camper and trailer. Cutlip paid Wise, and he and Appellant resided on the property until the time of the buy. The record reveals that Appellant also owned a house at a different location, however, it is unclear how much time she spent in each location.

**{¶5}** As to the buy at issue, Z.D. contacted Cutlip and inquired about purchasing methamphetamine. After some back and forth between the two men, they arranged to meet at the trailer. According to Officer Duplaga, law enforcement previously knew the address of the trailer's location through their investigation.

**{¶6}** Z.D. first went to the police department where he was provided $300 to purchase a "ball," which is described as one-eighth of an ounce of methamphetamine.

The amount of buy money was expected to be more than necessary, but Cutlip had not quoted a price. The money was photographed to keep track of the serial numbers on the bills. Officer Duplaga provided Z.D. with a fake fob, described as being similar to a vehicle key with the accompanying buttons. The fob included both an audio and video recording device. The idea was to allow Z.D. to record the encounter without having a detectable or obvious device on his person. Z.D. was instructed to leave his actual vehicle key inside his truck and bring the fake fob inside the trailer. Before Z.D. left, Officer T.J. Weyend searched him and found no contraband. Officer Weyend followed Appellant to the trailer location and parked a short distance away. Sergeant Randy Stewart had previously driven to the area and parked in a place where he could see the trailer.

{¶7} A review of the audio and video of the controlled buy is challenging, as Z.D. repeatedly rattled his keys which were attached to the fob, making it difficult to hear the audio at times. In addition, loud music playing in the background further hinders review of the audio. Because Z.D. was rattling his keys, the camera erratically travels around the room aimlessly, and so the video is also hard to watch. The only time the camera is stable is when it is pointed at a counter top. However, the following excerpts can be heard and are relevant and significant.

{¶8} When Z.D. arrived at the trailer, three people were apparently present: Cutlip, Appellant, and a woman named Robin Brown who may have also lived at the trailer. Shortly after Z.D. arrived, one of the women, either Appellant or Brown, left. The question at trial was whether the person who remained with Cutlip was Brown or Appellant. Officer Duplaga concluded that it was Appellant who remained.

Case No. 21 BE 0039

{¶9} While no female appears on video at any time during the recording, women's voices can be heard. One woman says, "see you in a couple of hours, my friend." (7/8/20 Controlled Buy Video at 20:57.) A different female voice can be heard roughly two minutes later. At the time, Z.D. and Cutlip are discussing a price for the drug and Cutlip is heard telling someone that Z.D. "asks me if [inaudible] ball was three. Will you tell the new zip?" (7/8/20 Controlled Buy Video at 21:07:52.) This female voice responds "uh…twenty-five."

{¶10} After the men converse for some time, Z.D. breached the confidential informant agreement and used a hypodermic needle to inject methamphetamine into his vein. It is difficult to hear much of the audio, but the woman seemed to express anger with Cutlip's carelessness in leaving contraband in plain sight. At one point, Cutlip says to Z.D., "I want you to meet Melanie, that way she knows, gets an idea." (7/8/20 Controlled Buy Video at 21:30:39.) Cutlip can be heard telling the woman "come here, Robin is going to be in here in a second to rattle your cage." (7/8/20 Controlled Buy Video at 21:32:33.) Cutlip asked Z.D. "you see how she's acting?" (7/8/20 Controlled Buy Video at 21:32:42.) The female responded "I'm worried about the front door getting kicked in and everything's out." (7/8/20 Controlled Buy Video at 21:32:51.) Almost immediately after this, Cutlip can be heard saying "this is Zack and this is Melanie." (7/8/20 Controlled Buy Video at 21:32:51.) These exchanges seem to support Officer Duplaga's conclusion that Appellant remained in the trailer during the buy.

{¶11} Shortly thereafter, Z.D. left the trailer and contacted Officer Weyend. They met a short distance from the trailer and Z.D. handed the officer $100 of the $300 he was given to complete the transaction and a baggie of methamphetamine. The remaining

money matched the serial numbers of the buy money he was given. Officer Weyend conducted a search of Z.D. subsequent to the buy and found no other contraband. Officer Duplaga remained at the police department throughout the process and drafted a search warrant and affidavit.

{¶12} Officer Duplaga obtained a signed search warrant on July 8, 2020 at 10:50 p.m. We note that at trial, Appellant contested the fact that the warrant authorized a no-knock nighttime search even though the application did not make such request. The officers did execute the search at nighttime, but the no-knock provision was unnecessary as Appellant and Cutlip were outside of the trailer when officers arrived.

{¶13} The search warrant video began by showing officers take Cutlip to the ground and handcuff him. Appellant was also handcuffed, but Robin Brown was not. The search warrant authorized a search for "Meth or any other illegal drug, any illegal drug paraphernalia, cell phones, or any other item that would be used to aide in 2925.03 or any other 2925 offense." (7/8/20 Search Warrant.) The warrant permitted a search of the entire trailer with no restrictions.

{¶14} The search produced the following contraband: six bags of methamphetamine (6.2 oz.), four bags of methamphetamine (3 oz.), five green baggies of methamphetamine (.7 oz.), one zip lock bag of methamphetamine (.4 oz.), five bags of methamphetamine (2.6 oz.), seven multicolored baggies of methamphetamine (1 oz.), sixteen multicolored baggies of methamphetamine (2.3 oz.), one bag of methamphetamine (1g.), two white pills labeled "RP 89," three orange and white pills labeled "S489 30mg," a small Rubbermaid container with a spoon containing the aforementioned .4 oz. zip lock bag, a counterfeit $100 bill, four $1 bills, non-scheduled

medication, six electronic scales, four cells phones, $200 of the controlled buy money, $3,500 cash, baggies, methamphetamine pipes, syringes, and other drug paraphernalia. (Search Warrant Return.)

{¶15} The methamphetamine pipes, empty baggies, syringes, and digital scales were located in the bedroom near where most of the methamphetamine was discovered. Officers located suboxone and other non-controlled pills near the headboard of the bed. A locked bookbag found in the bedroom contained some of the baggies of methamphetamine, scales, and other drug paraphernalia. Officers located a locked deposit bag underneath a pillow containing cash and several Speedway gift cards. Two safes were discovered, one underneath the bed and one next to the bed. In the safe underneath the bed, officers located 6.2 oz. of methamphetamine and a pill bottle with Cutlip's name on it. The other safe held 3.1 oz. of methamphetamine. The Rubbermaid container was found underneath the bed and the cell phones were found near the bed. In the living room area of the trailer, officers located a small baggie of methamphetamine and Robin Brown's purse, which contained two small "cut straw snort tubes" with white residue. In a vehicle on the premises which had been reported as stolen, officers located hypodermic needles and methamphetamine pipes.

{¶16} As a result of the search, Appellant and Cutlip were arrested. It is unclear why Robin Brown was not also arrested. On September 3, 2020, Appellant was indicted on: one count of aggravated trafficking in drugs, a felony of the first degree in violation of R.C. 2925.03(A)(2), (C)(1)(f); one count of aggravated possession of drugs, a felony of the first degree in violation of R.C. 2925.11(A), (C)(1)(E); and one count of aggravated trafficking in drugs, a felony of the third degree in violation of R.C. 2925.03(A)(1),

(C)(1)(C). The felony one aggravated trafficking count included a specification for forfeiture of money in a drug case ($3,700) in accordance with R.C. 2941.1417(A) and a major drug offender specification in accordance with R.C. 2942.1410(A). The aggravated possession count included a major drug offender specification. The felony three aggravated trafficking included a specification for forfeiture of money in a drug case ($3,700) in accordance with R.C. 2941.1417(A).

{¶17} Appellant and Cutlip were separately tried, with the state electing to first try Cutlip. Cutlip's convictions and sentence were affirmed by this Court in *State v. Cutlip*, 7th Dist. Belmont No. 21 BE 0032, 2022-Ohio-3524. The state subsequently tried Appellant in a three-day jury trial. Appellant was convicted on all counts on a complicity theory. On September 22, 2021, the court sentenced Appellant to an aggregate sentence having a minimum of fourteen years of incarceration and a maximum of nineteen and one-half years. The court credited Appellant with 318 days served. We note that the trial court sentenced Appellant to the maximum sentences in accordance with the major drug offender specification. It is from this entry that Appellant timely appeals.

<u>ASSIGNMENT OF ERROR NO. 1</u>

THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS.

{¶18} Appellant argues that the trial court erroneously denied her motion to suppress, as the search warrant affidavit failed to establish probable cause. However, the substance of Appellant's argument focuses on the officers' reliance on information obtained from an informant where reliability and veracity was not established. Appellant

points to Officer Duplaga's admission that the affidavit lacked information as to the informant's trustworthiness or reliability. Appellant contends that the good-faith exception does not apply, here, because the officer's reliance is entirely unreasonable. Finally, Appellant argues that Officer Duplaga testified to his belief that the warrant was boundless, meaning the entire camper could properly be searched pursuant to the warrant. Appellant's exact argument in this regard is unclear, however, she appears to take issue with the scope of the warrant.

{¶19} In response, the state emphasizes that the affidavit was based on a controlled buy, not the informant's description of what might be found on the premises. Thus, neither reliability nor veracity need be established. Further, the search warrant was obtained shortly after the buy and the warrant was executed within hours. As to whether law enforcement properly searched containers in the trailer, the state argues that a search of containers is permissible if a search of the general area is permitted and it is possible that the containers could contain contraband believed to be on the premises.

{¶20} "The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution secure an individual's right to be free from unreasonable searches and seizures and require warrants to be particular and supported by probable cause." *State v. Telshaw*, 195 Ohio App.3d 596, 2011-Ohio-3373, 961 N.E.2d 223, ¶ 12 (7th Dist.). In order for a search or seizure to be lawful, there must be probable cause to believe evidence of criminal activity will be found and the search or seizure must be executed pursuant to a warrant, unless an exception to the warrant requirement exists. *State v. Ward*, 7th Dist. Columbiana No. 10 CO 28, 2011-Ohio-3183, ¶ 33.

{¶21} In determining the sufficiency of probable cause in an affidavit submitted for a search warrant, a trial judge or magistrate must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *State v. Quin*, 5th Dist. Licking No. 2021 CA 00044, 2021-Ohio-4205, ¶ 8, citing *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1980), at paragraph one of the syllabus; *Illinois v. Gates*, 462 U.S. 213, 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶22} "When oral testimony is not offered in support of a search-warrant affidavit, the magistrate determines the sufficiency by 'evaluating only [the facts alleged within] the four corners of the affidavit and [applying] an objective reasonableness standard.' " *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 39, citing *United States v. Richards*, 659 F.3d 527, 559 (6th Cir. 2011), fn. 11 (Moore, J., concurring in judgment only); *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996).

{¶23} "[I]t is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' " (Emphasis deleted.) *State v. George*, 45 Ohio St.3d 325, 329, 544 N.E.2d 640 (1989), citing *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*George* at 329, citing *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**{¶24}** The Ohio Supreme Court has cautioned reviewing courts that the standard of review is not *de novo*, but instead the court must conduct a review of whether the issuing magistrate or judge had a " 'substantial basis for * * * conclude[ing]' that probable cause existed." *George* at 329.

**{¶25}** "A reviewing court affords great deference to the issuing judge's probable cause determination, and marginal cases are to be resolved in favor of upholding the warrant." *State v. Johnson*, 7th Dist. Mahoning No. 17 MA 0099, 2018-Ohio-2780, ¶ 16, citing *Castagnola* at ¶ 14; *George*, paragraph two of syllabus. "[T]he reviewing court is concerned exclusively with the statements contained within the affidavit itself." *Castagnola* at ¶ 39, citing *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996).

**{¶26}** We have previously addressed the affidavit in this case in Cutlip's direct appeal. Similar to Cutlip, Appellant argues that the affidavit failed to establish the veracity and reliability of the confidential informant on which law enforcement relied. In *Cutlip,* we acknowledged that the affidavit failed to satisfy the "indicia of veracity" requirement of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *Cutlip* at ¶ 45. We also acknowledged that the affidavit failed to acknowledge the completion of several procedures and protocols that must be followed, such as audio and visual recording and traceable money. We found significant the fact that the confidential informant returned from the trailer with methamphetamine which provided strong corroboration. *Id.* Thus, despite the deficiencies there was sufficient corroboration by independent police work.

**{¶27}** Appellant repeats Cutlip's argument that the affidavit failed to establish probable cause that contraband would be found at the location in question. In *Cutlip,* this Court held that "the affidavit states [Cutlip] was 'staying' at the camper at the time; he told the informant to go to this location; and the controlled drug buy occurred at that same camper, which resulted in the informant returning with methamphetamine." *Id.* at ¶ 53. Thus, we have already determined this issue in regard to this search warrant affidavit.

**{¶28}** Finally, Appellant appears to take issue with the scope of the warrant, which permitted a search of the entire trailer. Appellant is not specific in her arguments, but based on her motion to suppress filed at the trial court, it appears she takes issue with the search of a locked book bag, locked safes, and closed containers. The court in this case permitted a search of the trailer because that was where the controlled buy occurred, making it likely that contraband would be found. It is important to note that this is a one-story trailer that appears to consist of only a bedroom and a living room/kitchen area. As such, it is not unreasonable for the court to authorize a search of the entire trailer.

**{¶29}** As to the containers:

> Courts addressing the particularity requirement of the Fourth Amendment are concerned with two issues. The first issue is whether the warrant provides sufficient information to "guide and control" the judgment of the executing officer in what to seize. *United States v. Upham*, 168 F.3d 532, 535 (1st Cir.1999). The second issue is whether the category as specified is too broad in that it includes items that should not be seized. See *United States v. Kow*, 58 F.3d 423, 427 (9th Cir.1995).

Case No. 21 BE 0039

*Castagnola* at ¶ 79.

{¶30} The permissible scope of a search was described in a Fourth District case: "a search warrant must be limited 'to the specific areas and things for which there is probable cause to search' and 'carefully tailored to its justifications.' *Id.* The scope of a lawful search is therefore 'defined by the object of the search and the places in which there is probable cause to believe that it may be found.' " *State v. Hobbs*, 4th Dist. Adams No. 17CA1054, 2018-Ohio-4059, ¶ 67, citing *United States v. Ross*, 456 U.S. 798, 824, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

{¶31} The *Ross* Court explained in greater detail that:

A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found, and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marihuana would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the

case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.

*Id.* at 820-821.

**{¶32}** It is clear that the goal of the search was to locate methamphetamine which would likely be, and was in fact, stored inside of containers. It is not unreasonable for law enforcement to believe that evidence of drug trafficking and drug possession would be found in places such as safes, back packs, and underneath a bed. Thus, this search did not exceed the scope of the warrant. Appellant's first assignment of error is without merit and is overruled.

<u>ASSIGNMENT OF ERROR NO. 2</u>

APPELLANT'S CONVICTOIN [SIC] WAS AGAINST THE WEIGHT OF THE EVIDENCE.

<u>ASSIGNMENT OF ERROR NO. 3</u>

APPELLANT'S CONVICTION WAS NOT SUFFCENT [SIC] TO SUPPORT HER CONVICTION.

**{¶33}** Appellant concedes that there is sufficient evidence that the various crimes were committed. However, she argues that there is insufficient evidence to show that she participated in the crimes. While not conceding that the female voice in the recordings was her own, she urges that, at best, the evidence shows she is a drug addict who may have been present during a drug deal and merely may have stated the current price of drugs. Appellant argues that there is no evidence that she had access to the drugs or

money, which were in a locked safe. She contends that Robin Brown, who also associated with Cutlip, was present during the sale and had paraphernalia in her purse and a key to the safe containing the drugs and money.

**{¶34}** In response, the state provides an extensive bullet point list of the evidence presented at trial demonstrating Appellant's guilt. Among the evidence, the state lists evidence that: Appellant called to inquire about renting the trailer, Cutlip turned to Appellant to verify the price of methamphetamine, and Appellant can be heard on the audio worrying that the door might get kicked in during the transaction. The state also points to evidence that Cutlip repeatedly used terms such as "we," "our", and "she," suggesting the involvement of a female. Almost all of the methamphetamine seized during the search was found in the bedroom, along with pipes, baggies, a digital scale, and the money used to complete the controlled buy. Importantly, the state also highlights several jail-house phone calls where Appellant admitted that the seized, funds belonged to her, that she met the informant, a seized counterfeit bill came from her purse, and that the voice on the audio during the controlled buy was hers.

**{¶35}** "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, ¶ 49 (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper*, 7th Dist. Jefferson No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). When reviewing a conviction for sufficiency of the evidence, a reviewing court does not

determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci*, 7th Dist. Mahoning No. 13 MA 34, 2015-Ohio-1882, ¶ 14, citing *State v. Merritt*, 7th Dist. Jefferson No. 09-JE-26, 2011-Ohio-1468, ¶ 34.

**{¶36}** In reviewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

**{¶37}** In contrast, weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. It is not a question of mathematics, but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion. *Id.* at 390, 678 N.E.2d 541 (Cook, J. concurring). The appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, at 387, 678 N.E.3d 541, 678 N.E.2d 541. This discretionary power of the appellate court to reverse a conviction is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

Case No. 21 BE 0039

**{¶38}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. Jefferson No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 N.E.2d 650 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶39}** Under a complicity theory, a defendant can be prosecuted and punished as if he were a principal offender, even if the charge is stated in terms of the principal offense. *State v. Heard*, 7th Dist. Mahoning No. 17 MA 0064, 2019-Ohio-1227, ¶ 16, citing R.C. 2923.03(F). "A person is complicit if, acting with the kind of culpability required for the commission of an offense, he aids or abets another in committing the offense." *State v. Henderson*, 2018-Ohio-5124, 125 N.E.3d 235, ¶ 48 (7th Dist.), citing R.C. 2923.03(A)(2).

**{¶40}** Aiding and abetting exists where the defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime * * *." *Henderson* at ¶ 48, citing *State v. Johnson*, 93 Ohio St.3d 240, 245, 754

N.E.2d 796 (2001). "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *Id.* at 245.

**{¶41}** Again, Appellant does not contest that the crimes were committed. Instead, she argues that the state failed to establish she was complicit in committing those offenses. Here, the evidence concerning the identity of the female present during the transaction is found within the video of the controlled buy. We note that Z.D. testified against Cutlip but did not testify against Appellant. According to the state, Z.D. had reported a fever at the time of trial.

**{¶42}** Appellant argues, here, that the state's failure to present Z.D.'s testimony casts doubt on the state's conclusion that the voice belongs to her. It is noted that Appellant did not object to the state's assertion that it would not call Z.D. and she did not attempt to call him herself, despite the fact that he had been served with a subpoena. Regardless, there is no evidence that Z.D. ever told law enforcement that Appellant was inside the trailer at the time of the buy.

**{¶43}** Again, it appears that when Z.D. arrived at the trailer, three people were present: Cutlip, Robin Brown, and Appellant. Before the actual buy occurred, a female voice can be heard saying "see you in a couple of hours, my friend." (7/8/20 Controlled Buy Video at 20:57.) The state alleged that the person who made this statement and subsequently left the trailer is Robin Brown, leaving Cutlip and Appellant with Z.D..

**{¶44}** A different female voice can be heard roughly two minutes later as Z.D. and Cutlip are discussing price and Cutlip is heard saying that Z.D. "asks me if [inaudible] ball was three. Will you tell the new zip?" (7/8/20 Controlled Buy Video at 21:07:52.) The female voice responds "uh…twenty-five."

**{¶45}** Around ten minutes later, Cutlip said to Z.D., "I want you to meet Melanie that way she knows, gets an idea." (7/8/20 Controlled Buy Video at 21:30:39.) It is difficult to hear much of the audio but it appears that the woman was unhappy with Cutlip's openness and carelessness. Cutlip can then be heard saying "come here, Robin is going to be in here in a second to rattle your cage." (7/8/20 Controlled Buy Video at 21:32:33.) Cutlip asked Z.D. "you see how she's acting?" (7/8/20 Controlled Buy Video at 21:32:42.) The female voice responded "I'm worried about the front door getting kicked in and everything's out." (7/8/20 Controlled Buy Video at 21:32:51.) Almost immediately after this, Cutlip can be heard saying "this is Zack and this is Melanie." (7/8/20 Controlled Buy Video at 21:32:51.)

**{¶46}** After the woman left the trailer, Cutlip can clearly be heard introducing Z.D. to Melanie, which is Appellant's name. There is no evidence that the first woman returned before this introduction. Logically, it would appear that the woman who remained is Appellant. In addition, Cutlip told the woman "come here, Robin is going to be in here in a second to rattle your cage." It seems unlikely Cutlip would refer to the woman he was talking to in the third person. Cutlip also quipped to Z.D. "you see how she's acting?" This was clearly made in reference to the remaining woman. During a jail-house call after her arrest, Appellant can be heard discussing the matter with Cutlip:

[Appellant]: You were talking shit on me to cheese eater [Z.D.] twice.

[Cutlip]: I remember saying look how mad she gets, or crazy or something. Look at how she's acting.

[Appellant]: You said that, and some other things. That I'm a liar, that I lied to you about your title, and I'm keeping stuff from you and all kind of shit you were telling him about me.

(Exh. 49 10:52.)

**{¶47}** From these interactions, it can be gleaned with reasonable probability that Robin Brown is the woman who left the trailer and Appellant remained with Cutlip during the buy. Appellant argues that even if she was present, there is no evidence that she assisted Cutlip's efforts. However, the state presented evidence that Appellant arranged for the trailer to be placed at its location, despite the fact that she admittedly owns a house nearby. She can also be heard naming a price for the drug and voicing her concerns about law enforcement kicking down the door and finding evidence laying in the open. The woman is clearly nervous and uncomfortable, not with the transaction itself, but with Cutlip's carelessness and the possibility of being caught in the act. Appellant also made incriminating comments in a jailhouse call. This record reflects the state presented sufficient, credible evidence that Appellant assisted in Cutlip's efforts. As such, Appellant's second and third assignments of error are without merit and are overruled.

ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT ERRED IN APPLYING CONSECUTIVE SENTENCES.

**{¶48}** Appellant argues that although the trial court recited the statutory language of R.C. 2929.14(C)(4), there is no evidence to support those findings. Appellant contends she does not have a serious criminal record and there is no evidence that the crime was

Case No. 21 BE 0039

so great or unusual as to justify consecutive sentences. Appellant argues that the court relied only on the nature of the crimes and that she refused to confess to these crimes.

**{¶49}** The state responds by arguing that a trial court is not required to state its findings. Here, the state contends the record supports the court's finding that the offenses were committed as a course of conduct, the harm was unusual or great, and that Appellant's history of criminal conduct demonstrates the need for consecutive sentences.

**{¶50}** Pursuant to R.C. 2929.14(C)(4), before a trial court can impose consecutive sentences on a defendant, the court must find:

[T]hat the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

Case No. 21 BE 0039

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶51}** A trial court must make the consecutive sentence findings at the sentencing hearing and must additionally incorporate the findings into the sentencing entry. *State v. Williams*, 2015-Ohio-4100, 43 N.E.3d 797, 806, ¶ 33-34 (7th Dist.), citing *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. The court is not required to state reasons in support nor is it required to use any "magic" or "talismanic" words, so long as it is apparent that the court conducted the proper analysis. *Williams* at ¶ 34, citing *State v. Jones*, 7th Dist. Mahoning No. 13 MA 101, 2014-Ohio-2248, ¶ 6; *State v. Verity*, 7th Dist. Mahoning No. 12 MA 139, 2013-Ohio-1158, ¶ 28-29.

**{¶52}** The Ohio Supreme Court has recently readdressed consecutive sentence review. *State v. Gwynne*, -- Ohio St. 3d --, 2022-Ohio-4607, -- N.E.3d --. As to the standard of review, the *Gwynne* Court held that:

> The evidentiary standard for *changing* the trial court's order of consecutive sentences is not deference to the trial court; the evidentiary standard is that the appellate court, upon a de novo review of the record and the findings, has a "firm belief" or "conviction" that the findings—the criteria mandated by the legislature to be met before the exception to concurrent sentences can apply—are not supported by the evidence in the record.

*Id.* at ¶ 23, citing *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 22; see also *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954).

Case No. 21 BE 0039

> R.C. 2953.08(G)(2) does not require the high level of deference that comes with an abuse-of-discretion standard of review. This type of deference would permit a court of appeals to modify a defendant's sentence or to vacate the sentence and remand only when no sound reasoning process can be said to support the decision, or where the trial court exhibited an arbitrary or unconscionable attitude when it imposed the consecutive sentences.

*Gwynne* at ¶ 19, citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990); *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985).

{¶53} The Court then provided "practical guidance on consecutive-sentence review." *Id.* at ¶ 24. The Court explained that a consecutive sentence review is two-fold: first, whether the record contains the requisite R.C. 2929.14(C) findings. *Id.* at ¶ 25. Second, "[i]f the appellate court determines that the R.C. 2929.14(C)(4) consecutive-sentence findings have been made, the appellate court may then determine whether the record clearly and convincingly supports those findings." *Id.* at ¶ 26.

> The point here is that if even one of the consecutive-sentence findings is found not to be supported by the record under the clear-and-convincing standard provided by R.C. 2953.08(G)(2), then the trial court's order of consecutive sentences must be either modified or vacated by the appellate court.

*Id.*, citing R.C. 2953.08(G)(2).

**{¶54}** "When reviewing the record under the clear-and-convincing standard, the first core requirement is that there be some evidentiary support in the record for the consecutive-sentence findings that the trial court made." *Id.* at ¶ 28. "The second requirement is that whatever evidentiary basis there is, that it be adequate to fully support the trial court's consecutive-sentence findings. This requires the appellate court to focus on both the quantity and quality of the evidence in the record that either supports or contradicts the consecutive-sentence findings." *Id.* at ¶ 29. It is noted that *Gwynne* was released after briefing concluded in this matter, thus the parties do not cite *Gwynne* or apply its law.

**{¶55}** Appellant takes issue with the court's determination that her criminal record, which consisted of misdemeanors and traffic violations, was sufficient to find that her history of criminal conduct demonstrates consecutive sentences are necessary to protect the public from future crime. She also challenges whether sufficient evidence existed to demonstrate the harm here was so great or unusual as to justify the imposition of consecutive sentences.

**{¶56}** An offender's criminal history need not necessarily involve felonies for purposes of consecutive sentences. There is no legal precedent stating that misdemeanors cannot serve as the basis for consecutive sentences. Appellant has a criminal record involving two juvenile incidents and twenty-four charged offenses as an adult. Although mostly misdemeanors, Appellant does have a significant criminal record. We note that Appellant faced a separate set of charges for felony drug trafficking involving an incident committed mere months after the instant arrest which the court declined to consider, favoring Appellant to some degree.

**{¶57}** Appellant contends that the court relied only on the nature of the charges and her failure to confess. However, the state explained at the sentencing hearing that more than 400 grams of methamphetamine was recovered in this case, which likely would have been distributed within the community. (Sentencing Hrg. Tr., p. 9.) The record contains evidence of the large amount of drugs that were found at the trailer after the controlled buy. Again, that evidence included: six bags of methamphetamine (6.2 oz.), four bags of methamphetamine (3 oz.), five green baggies of methamphetamine (.7 oz.), one zip lock bag of methamphetamine (.4 oz.), five bags of methamphetamine (2.6 oz.), seven multicolored baggies of methamphetamine (1 oz.), sixteen multicolored baggies of methamphetamine (2.3 oz.), one bag of methamphetamine (1g.), two white pills labeled "RP 89," three orange and white pills labeled "S489 30mg," a small Rubbermaid container with a spoon containing the aforementioned zip lock bag, a counterfeit $100 bill, four $1 bills, non-scheduled medication, six electronic scales, four cell phones, $200 of the controlled buy money, $3,500 cash, baggies, methamphetamine pipes, syringes, and other drug paraphernalia. (Search Warrant Return.)

**{¶58}** It is clear from the amount of drugs and from instruments associated with trafficking drugs (digital scales, baggies, and large amounts of cash) that this was a significant enterprise and involved at least a moderate level of drug sales. This provides evidence that the harm was so great or unusual as to justify the imposition of consecutive sentences. As such, Appellant's fourth assignment of error is also without merit and is overruled.

## Conclusion

**{¶59}** Appellant contests the search warrant and supporting affidavit used in her arrest, and challenges the sufficiency and weight of the evidence asserted at trial. She also argues that the court improperly ordered her sentences to run consecutively. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

D'Apolito, P.J., concurs.

Hanni, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**